491 F.2d 1053
 7 Fair Empl.Prac.Cas. 586, 7 Empl. Prac. Dec. P 9237
Willie L. MORROW and Jerome Mangum, Individually and on
behalf of all others similarly situated,
Plaintiffs-Appellants-Cross Appellees,
v.
Giles CRISLER Commissioner of Public Safety of Mississippi
et al.,Defendants-Appellees-Cross Appellants.
 No. 72-1136.
 United States Court of Appeals, Fifth Circuit.
 March 27, 1974.
 
 Frank R. Parker, Constance Iona Slaughter, Jackson, Miss., for plaintiffs-appellants-cross appellees.
 David L. Rose, Chief, Employment Section, William B. Fenton, Dept. of Justice, Civ. Rights Div., Washington, D.C., Morris S. Dees, Jr., Joseph J. Levin, Jr., Montgomery, Ala., for amicus curiae.
 William A. Allain, First Asst. Atty. Gen., P. Roger Googe, Jr., Special Asst. Atty. Gen., Charles A. Marx, Heber Ladner, Jr., Jackson, Miss., for defendants-appellees-cross appellants.
 Before BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, RONEY and GEE, Circuit Judges.
 GEWIN, Circuit Judge:
 
 
 1
 This case involves racial discrimination in the employment practices of the Mississippi Highway Patrol. There being no question that the Highway Patrol has historically engaged in unconstitutional discrimination in the employment of patrolmen, the only question that brought this case en banc is whether the District Court ordered sufficient affirmative relief to eradicate the State's unconstitutional employment practices and their effects.
 
 
 2
 Experience since the entry of the decree provides this Court on rehearing with the hindsight to determine what was fathomed by foresight in the dissent from the panel opinion: the relief ordered by the District Court is insufficient. When this case was heard by the original panel in June 1972, the Highway Patrol had four black patrolmen. By the time the case was heard by the en banc Court in October 1973, there were six black patrolmen-- six black patrolmen hired since entry of the decree during a period when 91 patrolmen were added to a total force of approximately 500 troopers.
 
 
 3
 These figures alone negate the State's argument that its present practices are nondiscriminatory, and give no support whatsoever to any argument that the decree appealed from is sufficient to eliminate the effects of past racial discrimination. Although we have difficulty seeing how any good faith argument could be made that the State has fulfilled the spirit, intent, and purpose of the District Court decree, counsel reported at oral argument before the en banc Court that the Highway Patrol has fully complied with the precise terms of the order. This illuminates plaintiffs' argument that the District Court must order additional specific relief if the Mississippi Highway Patrol's employment practices are ever to pass constitutional muster.
 
 
 4
 The controlling facts of the case and the District Court's decree are fully set forth in the panel opinions reported at 479 F.2d 960 (5th Cir. 1973). The majority affirmed the decree on the ground that it did not appear that the relief granted was inadequate to remedy the constitutional wrong. It was noted that
 
 
 5
 Time may prove that the District Court was wrong, i.e., that the relief ordered was not sufficient to achieve a nondiscriminatory system and eliminate the effects of past discrimination . . .. The Court has retained jurisdiction to make the decree work. If it has ordered too much, it may modify the decree when it appears necessary. If it has not ordered enough, it may change the decree to require such additional relief as it determines to be necessary to remedy the wrong.
 
 
 6
 479 F.2d at 964. The undisputed results of the decree as reported to us on rehearing prove that the District Court was wrong, and the en banc Court now decides that the case should have been and must now be remanded for the District Court, in the first instance, to fashion an appropriate decree which will have the certain result of increasing the number of blacks on the Highway Patrol. Although we are mindful of our limited role in fashioning equitable decrees, we deem it fitting to adumbrate guidelines to aid the District Court.
 
 
 7
 The appellees represent that they have hired every black applicant who has met qualifications for employment. If this be true, it is apparent that either the qualifications are discriminatory in effect, or the State has not conducted a sufficient recruitment campaign to enlist blacks who meet those requirements. It is the recruitment and the hiring criteria that the District Court should scrutinize on remand.
 
 
 8
 The reputation of the Patrol in the black community as a discriminatory employer has posed a formidable obstacle to the achievement of a Patrol which has eradicated all of the effects of past discriminatory practices. To counteract this reputation, the District Court ordered the Patrol to conduct an affirmative recruitment program. The efficacy of this program is belied by appellees' assertion that qualified blacks are not in fact applying for positions. Since we are not sanguine enough to be of the view that benign recruitment programs can purge in two years a reputation which discriminatory practices of approximately 30 years have entrenched in the minds of blacks in Mississippi, on remand the District Court should order that additional appropriate recruitment measures be taken to insure that black applicants will be attracted to the force.
 
 
 9
 The Department's hiring criteria should also be reexamined. Employment is presently conditioned upon possession of a high school diploma and passage of the Army General Classification Test, neither of which has been validated as a proper job requirement despite the fact that their propriety has been called into question. It may be that the diploma and test score requirements (a score of 110) are higher than needed to qualify those applicants who can perform the work of a Highway Patrolman. Such tests should be job validated. Moreover, the state should be required to defend by clear and convincing evidence the necessity of any additional objective requirements which black applicants have difficulty in satisfying.
 
 
 10
 Beyond insuring that objective hiring criteria are utilized, it will be incumbent on the District Court to order some affirmative hiring relief. It may, within the bounds of discretion, order temporary one-to-one or one-to-two hiring, the creation of hiring pools, or a freeze on white hiring, or any other form of affirmative hiring relief until the Patrol is effectively integrated. We emphasize, however, that the imposition of some affirmative hiring relief need not inexorably lead to the dilution of valid employment qualifications.
 
 
 11
 The duration of the affirmative hiring relief shall be determined by the District Court. When it is convinced that the measures undertaken by the Patrol effectively offset the effects of past discrimination, such affirmative hiring relief can be terminated. It is not required that the proportion of blacks on the Patrol mirror the proportion of blacks in the population. However, in view of the protracted and pervasive discrimination practiced by the Department and the inefficacy of the prior decree in producing a more integrated Patrol, the burden will be upon the Patrol to prove that the residual effect of past discrimination has in fact been eliminawted. Moreover, prior to the cessation of affirmative hiring programs, where any black individual challenges the Patrol's refusal to employ him, the Patrol must show that such refusal was for legitimate job related reasons.
 
 
 12
 Upon completion of its scrutiny of the recruitment program and hiring criteria consistent with the aforementioned principles, the District Court should require the Department to fashion and submit for immediate approval and subsequent periodic review a plan which incorporates the District Court's mandates. As we have said in other contexts involving discrimination, the plan submitted to the District Court and subject to its ultimate enforcement must be one that works and works now. Discriminatory hiring policies must be eliminated and the evils of their existence eradicated. Nothing less is countenanced by the applicable law.
 
 
 13
 Competition is keen for able and competent blacks in the law enforcement area. Salaries are limited by legislative enactment. Public bodies cannot fully engage in salary and benefit competition which is available to the private sector. From the record in this case, it is obvious that the Highway Patrol probably cannot successfully engage in this competition through mere mechanical obedience to the words of a judicial decree. Imaginative initiative is needed from all present members of the Highway Patrol.
 
 
 14
 To achieve success in this case, the plaintiffs and the defendants need to fully cooperate with each other and with the Court. The plaintiffs, as a class, seeking equity must do equity and might well be required to give full assistance in the recruitment of qualified black applicants.
 
 
 15
 This case is remanded to the District Court for such immediate interim orders, further proceedings, and final action as may be consistent with this opinion.
 
 
 16
 The panel opinion is affirmed as to the individual appeals. The District Court shall reconsider the award of the amount of attorney's fees, and shall award such fees as may be appropriate for this appeal and further proceedings. See Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974); Clark v. American Marine Corp., 320 F.Supp. 709, aff'd,437 F.2d 959 (5th Cir. 1971).
 
 
 17
 Remanded.
 
 
 18
 BROWN, Chief Judge, with whom WISDOM, Circuit Judge, joins (concurring):
 
 
 19
 Although I have joined without reservation in Judge Gewin's opinion for us, I write this concurrence to respond to Judge Clark's concurrence. Although perhaps literally directed to race-selective hiring his insistence that by this action 'we break judicial new ground in this Circuit' leads me to read it broadly as asserting that this is so wholly unprecedented that were it not for the vast body of law from sister Circuits his doubts 'that its constitutional validity can be reasonably articulated' would have led him to dissent. But this is not new and startling. Rather than followers we have been in the van. We are not Johnny-come-latelys to the eradication of racial discrimination through race conscious means.
 
 
 20
 I wish to put the Court's decision in proper historical perspective. In voting rights cases of the early 1960's, this Court adopted what has been characterized as the deep freeze principle, a remedy designed to ensure that until all traces of discrimination against blacks were removed, blacks would be accorded the same treatment as that accorded whites in the era of discrimination. The object was to give blacks this right to catch up. To achieve that goal, blacks had to be dealt with as blacks.[1]
 
 
 21
 While Judge Clark recognizes the Court's use of 'color conscious' relief to remedy discrimination in the schools, we have imposed ratios in hiring of teachers and replacement of those displaced by desegregation orders.[2]
 
 
 22
 Similarly, under Title VII we have frequently sanctioned use of the race conscious 'rightful place theory' under which incumbent black employees may use plant, company or terminal seniority despite a collective bargaining agreement mandate of job, unit or craft seniority in order to eradicate the present effects of past discrimination.[3] Furthermore we have approved of an interim one-for-one black-white referral system pending the development of objective Union membership criteria.[4]
 
 
 23
 Likewise in grand and petit jury selection cases we have many times held that to achieve the constitutional goal of a fair cross section of the community the state must consciously take into account identifiable groups such as blacks.[5]
 
 
 24
 Use of race consciousness as a part of the judicial remedy to overcome or alleviate past discrimination is neither new to the Fifth Circuit nor in need of outside assistance from our sister Circuits, much as we welcome it.
 
 CLARK, Circuit Judge (concurring):
 
 25
 Insofar as our mandate permits the district court in its discretion to require the use of quotas or other forms of race-conscious hiring relief here, we break judicial new ground in this circuit. Not only the novelty but also the sweep of today's precedent-- applying as it does to all appointed officials-- persuades me to record this concurrence.
 
 
 26
 Unfortunately, no court has ever adequately rationalized the constitutional infirmities suggested in Judge Gee's dissent that are inherent in requiring 'affirmative hiring practices' based upon race. When the first Mr. Justice Harlan dissented in Plessy v. Ferguson, 163 U.S. 537, 554-555, 16 S.Ct. 1138, 1145, 41 L.Ed. 256 (1896), he put this side of my problem more aptly than I can.
 
 
 27
 In respect of civil rights, common to all citizens, the constitution of the United States does not, I think, permit any public authority to know the race of those entitled to be protected in the enjoyment of such rights. Every true man has pride of race, and under appropriate circumstances, when the rights of others, his equals before the law, are not to be affected, it is his privilege to express such pride and to take such action based upon it as to him seems proper. But I deny that any legislative body or judicial tribunal may have regard to the race of citizens when the civil rights of those citizens are involved.
 
 
 28
 It is logically inconsistent to propound in one breath the ideal abstraction that 'our Constitution is color-blind, and neither knows nor tolerates classes among citizens . . . (who) are equal before the law,' Plessy v. Ferguson, supra, 163 U.S. at 559, and in the next to assert that the same document allows an appellate tribunal to mandate the utilization of overt classification by race as a remedy for past wrongs. Yet I recognize that in the context of integrating public educational institutions this court has stated:
 
 
 29
 The Constitution is both color blind and color conscious. To avoid conflict with the equal protection clause, a classification that denies a benefit, causes harm, or imposes a burden must no be based on race. In that sense, the Constitution is color blind. But the Constitution is color conscious to prevent discrimination being perpetuated and to undo the effects of past discrimination. The criterion is the relevancy of color to a legitimate governmental purpose.
 
 
 30
 United States v. Jefferson County Board of Education, 372 F.2d 836, 876 (5th Cir. 1966), aff'd en banc, 380 F.2d 385 (1967), cert. denied, Caddo Parish School Bd. v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967). In the same context, the Supreme Court has clearly affirmed the use of 'mathematical ratios' by a federal chancellor as a 'useful starting point in shaping a remedy to correct past constitutional violations.' Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 26, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971).
 
 
 31
 Despite congressional proscriptions against preferential treatment or utilization of race as a factor in the decision not to hire, 42 U.S.C. 2000e-2(a), (j); see also Griggs v. Duke Power Company, 401 U.S. 424, 431-432, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971), other circuits have not hesitated either to affirm, approve or institute orders requiring affirmative hiring relief when deemed necessary to eradicate the present effects of past discrimination in suits brought under Title VII of the Civil Rights Act of 1964. See, e.g., United States v. N. L. Industries, Inc., 479 F.2d 354 (8th Cir. 1973); United States v. IBEW Local No. 212, 472 F.2d 634 (6th Cir. 1973); United States v. Wood Lathers Local No. 46, 471 F.2d 408 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973); United States v. Carpenters Local No. 169, 457 F.2d 210 (7th Cir.), cert. denied, 409 U.S. 851, 93 S.Ct. 63, 34 L.Ed.2d 94 (1972); United States v. Ironworkers Local No. 86, 443 F.2d 544 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); United States v. IBEW Local No. 38, 428 F.2d 144 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970). We have too. Asbestos Workers Local No. 53 v. Vogler, 407 F.2d 1047 (5th Cir. 1969).
 
 
 32
 The Philadelphia Plan and other similar programs, which pursuant to Executive Order require minority representation in federally-assisted construction projects, have been specifically approved. See, e.g., Southern Illinois Builders Association v. Ogilvie, 471 F.2d 680 (7th Cir. 1972); Contractors Association v. Shultz, 442 F.2d 159 (3d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); Joyce v. McCrane, 320 F.Supp. 1284 (D.N.J., 1970); see also Associated General Contractors v. Altshuler, 490 F.2d 9 (1st Cir. 1973).
 
 
 33
 Four of our sister circuits have approved requiring the use of affirmative hiring relief by public agencies that have engaged in employment practices which have been shown to have a racially discriminatory effect. See, e.g. Vulcan Society v. Civil Service Commission, 490 F.2d 387 (2d Cir. 1973); Bridgeport Guardians, Inc. v. Bridgeport Civil Service Commission, 482 F.2d 1333 (2d Cir. 1973); Pennsylvania v. O'Neill, 473 F.2d 1029 (3d Cir. 1973) (en banc); Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972); Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971) (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); but see Harper v. Kloster, 486 F.2d 1134 (4th Cir. 1973).
 
 
 34
 Despite my doubts that its constitutional validity can be reasonably articulated, this overwhelming precedent constrains me to concur in holding that the imposition of quota hiring relief is a permissible exercise of the federal chancellor's discretion.
 
 
 35
 The statistics which Judge Coleman has developed as to other similar agencies cogently demonstrate that Mississippi is not unique, but they also reinforce by belief that, given the legal power to impose it, this powerful discretion should be vested in the trial court here. This is especially true in light of the fact that the Mississippi Highway Patrol urges on oral argument that it is already engaging in the practice of hiring every qualified black applicant.
 
 
 36
 I do not understand the majority opinion to require the dilution of any valid employment qualification as an adjunct of achieving the intergration it requires and would not concur if it did, for such a proviso or consequence would be contrary to common sense and every prior precedent. Surely, too, it is implicit in what we say that if any affirmative relief provision imposed should prove unworkable, the defendant officials would petition for and be entitled to supplemental relief. Therefore, I find no refuge in Judge Roney's suggestion of preferential black hiring, which is obviously encompassed in the majority's 'affirmative hiring relief' anyway.
 
 
 37
 With deference to Chief Judge Brown and Judge Wisdom, I had not the slightest intention of underbilling the pioneer spirit which has marked this circuit's broad range of integration ratio and other race-based relief orders. However, today our national concepts of a proper solution to the chronic problem of race relations are in a state of flux. At a time when conservative resistance to mandates for social change has begun to melt, the liberal elite openly voice doubts that past remedies are efficacious and suggest that egalite be pursued in forms that differ from 'separate but equal' in name only. In such a situation I deem it important to record that (1) no holding by this or any other court has yet spelled out how quota relief can be squared with constitutional fundamentals, (2) employment quotas have never been ordered by this circuit, and (3) if precedent did not compel concurrence, I would opt for a different course.
 
 
 38
 RONEY, Circuit Judge, with whom BELL and AINSWORTH, Circuit Judges, join (concurring specially):
 
 
 39
 I concur in the result and in most of the text of the above opinion. I do not concur, however, in that portion of the opinion which indicates approval of a temporary hiring quota.
 
 
 40
 Although the opinion rejects the idea that a hiring quota would dilute valid employment qualifications, that result seems inevitable to me in the context of this case. The record does not indicate the availability of blacks meeting present qualifications. The State reported at oral argument that since the decree the Patrol has hired every black applicant found qualified under present standards. We do not yet know the potential availability of blacks meeting the minimal employment qualifications that will eventually be approved by the District Court. Until qualified blacks become available for employment, a hiring quota will either require employment of underqualified or nonqualified blacks or effect a freeze on hiring. Yet the majority disclaims any suggestion of hiring unqualified people. Moreover, an effective freeze on hiring could subvert the Patrol's primary purpose of protecting the public.
 
 
 41
 A temporary requirement that the Patrol hire every black applicant who meets the minimal qualifications which the Court may finally determine to be valid would not invite such an adverse result. Relief of that nature might be in order until a sufficient number of blacks have been hired to overcome the effects of the past discriminatory employment practices on the Patrol. Hiring goals, hiring timetables, and the provision of additional training are all worthy of consideration by the District Court, but a fixed quota, temporary or permanent, could well prove counter-productive.
 
 COLEMAN, Circuit Judge (dissenting):
 
 42
 I agree that no properly qualified person should be denied appointment to the Mississippi Highway Safety Patrol on account of race, color, religion, national origin, or any other factor contrary to the basic principles protected by the Fourteenth Amendment. That is not my difficulty with this appeal. It appears clear to me that the majority opinion incorrectly travels beyond Constitutional requirements in several respects; therefore, I must respectfully dissent to much of the language appearing therein. I have particular reference to the open hints that minimum requirements for eligibility may be reduced, that the requirement of a high school diploma or its equivalent may be dispensed with, and that the State may not really satisfy itself of the intelligence of those who are to be trusted with such crucial responsibility. Finally, I do not wish to be understood as agreeing to 'quota hiring', temporary or otherwise.
 
 
 43
 With deference, the fundamental error of the majority opinion is in its approach to intelligence and educational qualifications for Mississippi state highway patrolmen as if they were mere 'jobholders' or 'employees', performing routine activities, when the truth is that they are state officials, charged with the execution of duties vital to the enforcement of the law and the preservation of human life on the highways, demanding the daily exercise of sound discretion.
 
 
 44
 By an Act approved April 1, 1938, Chapter 143, Laws of Mississippi of 1938, the Mississippi Legislature created a highway safety patrol, to be composed of not more than 53 men (now expanded to 425), to be elected after an examination as to physical and mental fitness, knowledge of traffic laws, the law of arrest, and acquaintance with the rules and regulations of the State Highway Commission, the Public Service Commission, and the Motor Vehicle Commissioner. Each patrolman was required to furnish bond in the sum of $5,000 for the faithful performance 'of the duties of his office'. After twelve months service, no patrolman may be dismissed except upon written order of the governor, after a hearing on charges filed not less than ten days in advance.
 
 
 45
 These factors made these men officials, not employees or jobholders, State v. McLaurin, 159 Miss. 188, 131 So. 89 (1930); Golding v. Armstrong, 231 Miss. 889, 97 So.2d 379 (1957).
 
 
 46
 Certain classes of patrolmen are vested with general peace officer jurisdiction throughout the State, as in the case of the Texas Rangers. By the duly published proclamation of the governor, all patrolmen may be assigned general peace officer jurisdiction in order to suppress mob violence, crimes of violence, riots, and acts of intimidation or terror. All patrolmen are armed with 357 magnum pistols and other highly effective weapons. Moreover, in their enforcement of the highway safety laws they encounter every year hundreds of deaths and thousands of personal injuries on the highways.
 
 
 47
 Patrolmen are generally on duty for twelve hours a day, for specified days of the week, and may be transferred at the discretion of the Commissioner to any point in the State where it is believed that their services may best be utilized. These officers deal constantly and continuously with interstate and intra-state travellers, law abiding or otherwise. They are subjected to all the hazards of any uniformed police officer and, regretfully, some in the line of duty have lost their lives since 1938. An unintelligent, untrained officer, possessed of less than average judgment and ability, armed as he has to be, may be a hazard to the travelling public. I believe that these officers perform functions which are of compelling state interest.
 
 
 48
 I cannot agree that the Fourteenth Amendment was ever intended to mean, nor that it requires, that citizenry and visitors, travelling under the protective cloak provided by the Constitution of the United States, must be subjected to arrest, imprisonment, and even more deadly dangers at the hands of incompetent officers of whatever race.
 
 
 49
 Every state in the Fifth Circuit requires that its highway patrolmen shall have a high school education or its equivalent, except Texas, which requires 45 semester hours of college.
 
 
 50
 It is too late to weep when some under-educated, subnormally intelligent individual, white or black, armed with deadly weapons, unjustifiably launches a human being into eternity or severely wounds him or impermissibly deprives him of his liberty simply because that officer was thrust into a position for which he lacked the education, the intelligence, and the sound judgment to deal with problems which highway patrolmen have to encounter every day. Moreover, it is too late to weep for the officer's wife and children when he is brought home a corpse, the victim of a criminal who had the mental advantage of him from the start. So, as a court of equity, as we are in this case, we should be extremely wary of the exercise of our own discretion to downgrade the quality of enforcement and protection which the people are entitled to expect on the highways.
 
 
 51
 That is not all. I believe that under the binding precepts of federal-state relations, the state has the right to prescribe the qualifications and duties of those state officials who are charged with the performance of purely state functions, certainly so, as long as those qualifications are neither arbitrary, nor unreasonable, nor capricious, nor racially discriminatory.
 
 
 52
 I refer to the language of the Supreme Court in Carter v. Jury Commission of Greene County, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970):
 
 
 53
 'It has long been accepted that the Constitution does not forbid the States to prescribe relevant qualifications for their jurors. The States remain free to confine the selection to citizens, to persons meeting specified qualifications of age and educational attainment, and to those possessing good intelligence, sound judgment, and fair character. 'Our duty to protect the federal constitutional rights of all does not mean we must or should impose on states our conception of the proper source of jury lists, so long as the source reasonably reflects a crosssection of the population suitable in character and intelligence for that civic duty'.' 90 S.Ct. at 525.
 
 
 54
 If this may be said of those who are to perform the comparatively safe functions of a juror, and under the directions of a presiding judge, then how much more true should it be of those who are to spend their days in the highly transitory conditions of the highways, apprehending criminals, succoring the injured, handling fatalities, and trying to improve driving practices.
 
 
 55
 The test is whether the qualifications are 'capable of being carried out with no racial discrimination whatsoever'. Id., at 526.
 
 
 56
 There is nothing in this record to suggest that Mississippi is so bereft of Negro high school graduates and college trained persons that it has no adequate pool of qualified individuals for highway patrol service. I think common knowledge shouts loudly to the contrary. Of course, one cannot be drafted into the patrol, as he can be for military service, and there are many who are reluctant to undertake this dangerous work. There are many who do not like twelve hour days or transfers to strange territory. That, in a free society, is their privilege. It should not, however, be converted into an engine for the employment of individuals, of any race, who, unfortunately, are of inadequate intelligence or handicapped by lack of a reasonable education. Indeed, it smacks of judicially asserted notions of racial inferiority to suggest that standards of intelligence and education have to be relaxed if the Negro applicant is to be able to meet the requirements. I am sure the majority had no such thought in mind.
 
 
 57
 The majority opinion states that the District Court 'may, within the bounds of discretion, order temporary one-to-one or one-to-two hiring, the creation of hiring pools, or a freeze on white hiring, or any other form of affirmative hiring relief until the Patrol is effectively integrated'.
 
 
 58
 If 'temporary' quotas are permissible, I fail to see why a 'permanent' quota would be impermissible. Relying on Harper v. Koster, 4 Cir., 1973, 386 F.2d 1134, and especially in view of our dealing with state officials rather than mere employees performing routine tasks, I would make it clear to the District Court that hiring quotas and 'white freezes' are not appropriate tools in the resolution of this problem. I agree with what the District Court said in Harper v. Mayor and City Council of Baltimore, 359 F.Supp. 1187, 1213-1215, affirmed in Harper v. Kloster, supra, that the Supreme Court has not dealt with the granting of favors or the creation of rights on a racial basis as part of a court's remedial powers, that, without regard to race, all prospective employees and all prospective state officials have the right to consideration for selection and that the courts should not reenforce the view that it is the race of applicants which is important rather than their qualifications. In other words, the public is not required to sacrifice the qualifications of those who serve it and the qualified are not to be denied appointment or employment because of their race.
 
 
 59
 If I had the right to decide this case on my own, I would remand it to the District Court with the following directions:
 
 
 60
 1. The right of the State to prescribe the qualifications of those who are to perform highway patrol functions shall be undisturbed;
 
 
 61
 2. The District Court will supervise the compilation of a racially neutral intelligence test from which the State can, and will be required to, fairly and impartially determine the intelligence of its prospective officers;
 
 
 62
 3. The Mississippi Highway Safety Patrol will be required semi-annually to visit every his school graduating class and every college campus in the State for the purpose of announcing that it is seeking to recruit highway patrolmen, without regard to race or color, from among those qualified to undertake the work, explaining the qualifications in a thoroughly understandable manner. Similar announcements should be made in the press, on the radio, and by television;
 
 
 63
 4. No qualified black applicant may be passed over for an appointment in the Mississippi Highway Safety Patrol except for an applicant who clearly and objectively possesses higher qualifications for that particular appointment;
 
 
 64
 5. Appropriate qauarterly reports shall be required to insure that no duly qualified black person has been denied an appointment on account of race.
 
 
 65
 This approach should banish race as a factor in the appointment of highway patrolmen, without sacrificing the competency of the organization.
 
 
 66
 It is noted from the figures in this record that in 1972, forty-seven white applicants and one black applicant were rejected for failure to pass the physical examination, while sixty-six white applicants and fifty-four black applicants failed the prescribed intelligence test, the racially neutral character of which has not been established. In any event, there is plenty of room to say that in the search for high quality patrol officers, both whites and blacks have been rejected in substantial numbers. It only remains for the highway patrol, in the pursuit of competence, to immunize itself in an indisputable manner from all appearances of racial discrimination. Certainly, in the proper application of racially neutral intelligence tests, plus the requirement of a high school education or its equivalent, that goal can be achieved.
 
 
 67
 I close by pointing out that we are not here dealing with a problem peculiar to Depressing the competency of the Mississippi Highway Patrol will prove to be a bad precedent for the other states of this Circuit. According to the best records publicly available, on February 11, 1974 the racial composition of the highway patrols in these six states was as follows:
 
 
 68
 State White Black
----------- ----- -----
Alabama 335 13
Florida 1088 12
Georgia 677 7
Louisiana 689 11
Mississippi 543 5
Texas 1356 16
 
 
 69
 If the education and the intelligence of the Mississippi Highway Patrol are to be diminished by judicial decree, no prophet is required to name the next on the schedule for similar treatment.
 
 
 70
 I would remand the case for a more meaningful effort to recruit qualified patrolmen of the Negro race, but not by the methods hinted by the majority opinion. As to those features of the opinion, I respectfully dissent.
 
 
 71
 GEE, Circuit Judge (concurring in part and dissenting in part):
 
 
 72
 Agreeing as I do with almost the entire text of the majority opinion, and troubled moreover by a progress toward racial parity in hiring practices of such glacial slowness as to suggest the possibility of recalcitrance, I am yet unable to concur in the opinion's approval of racial hiring quotas or a freeze on white hiring as remedies appropriate for application by the district court. That they would be effective is plain. That they are constitutional, to me, less so.
 
 
 73
 As to these remedies, it is a strangely familiar message which the Court finds the Fourteenth Amendment has today for the qualified white applicant who is rejected solely because of his race. Indeed, it is the same message which the Constitution had only yesterday for the qualified but segregated Negro schoolchild: all people are equal, but some are more equal than others.
 
 
 74
 Today, integration is seen as an overriding end, yesterday segregation. The Constitution should be above the day's fashion in moral imperatives. We here advance some distance along what seems to me a wrong turning, but it may be that another cross-roads is at hand. See DeFunis v. Odegaard, 82 Wash.2d 11, 507 P.2d 1169 (1973), cert. g'td, 414 U.S. 1038, 94 S.Ct. 538, 38 L.Ed.2d 329 (1973).[1]
 
 
 
 [1]
 United States v. Duke, 5 Cir., 1964, 332 F.2d 759; United States v. Mississippi, 5 Cir., 1964, 339 F.2d 679; United States v. Ward (Miss.), 5 Cir., 1965, 345 F.2d 857; United States v. Ramsey, 5 Cir., 1965, 353 F.2d 650; United States v. Mississippi (Walthall County), 5 Cir., 1964, 339 F.2d 679; United States v. Ward (Louisiana), 5 Cir., 1965, 349 F.2d 795, modified on rehearing, 352 F.2d 329; United States v. Lynd, 5 Cir., 1962, 301 F.2d 818, cert. denied, 1963, 371 U.S. 893, 83 S.Ct. 187, 9 L.Ed.2d 125; Kennedy v. Lynd, 5 Cir., 306 F.2d 222, cert. denied, 371 U.S. 952, 83 S.Ct. 507, 9 L.Ed.2d 500; United States v. Lynd, 5 Cir., 1965, 349 F.2d 785; United States v. Alabama, 5 Cir., 304 F.2d 583, cert. granted, judgment affirmed, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112; United States v. Dogan, 5 Cir., 1963, 314 F.2d 767; Toney v. White, 5 Cir., 1973, 476 F.2d 203, modified and affirmed en banc, 488 F.2d 310. Similar relief was made available through three-Judge courts within the Circuit. See United States v. Louisiana, E.D.Louisiana, 3-Judge, 1963, 225 F.Supp. 353, affirmed, 380 U.S. 145, 155-156, 85 S.Ct. 817, 823, 13 L.Ed.2d 709, 716; United States v. Mississippi, S.D.Miss., 3-Judge, 1964, 229 F.Supp. 925, reversed and remanded, 1965, 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717. This principle of freezing was legislatively prescribed in the Voting Rights Act of 1965, 79 Stat. 437, 42 U.S.C.A. 1973b(a), 1973c
 
 
 [2]
 United States v. Jefferson County Board of Education, 5 Cir., 1966, 372 F.2d 836, affirmed en banc, 1967, 380 F.2d 385, 394; Singleton v. Jackson Municipal Separate School Dist., 5 Cir., 1969, 419 F.2d 1211, 1217-1218 (Singleton III) (en banc); McLaurin v. Columbia Municipal Separate School Dist., 5 Cir., 1973, 478 F.2d 348, en banc court dissolved, 486 F.2d 1049; Adams v. Rankin County School Board, 5 Cir., 1973, 485 F.2d 324; Lee v. Macon County Board of Educ., 5 Cir., 1971, 453 F.2d 1104
 
 
 [3]
 Local 189, United Papermakers and Paperworkers v. United States, 5 Cir., 1969, 416 F.2d 980, 988, cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100; United States v. Jacksonville Terminal Co., 5 Cir., 1971, 451 F.2d 418, cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972); United States v. Hayes International Corporation, 5 Cir., 1972, 456 F.2d 112; Bing v. Roadway Express, Inc., 5 Cir., 1973, 485 F.2d 441 and 444 F.2d 687
 
 
 [4]
 Local 53 Asbestos Workers v. Vogler, 5 Cir., 1969, 407 F.2d 1047
 
 
 [5]
 Brooks v. Beto, 5 Cir., 1966, 366 F.2d 1, cert. denied, 386 U.S. 975, 87 S.Ct. 1169, 18 L.Ed.2d 135, reh. den., 386 U.S. 1043, 87 S.Ct. 1489, 18 L.Ed.2d 618; Rabinowitz v. United States, 5 Cir., 1966, 366 F.2d 34; Labat v. Bennett, 5 Cir., 1966, 365 F.2d 698, cert. den., 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334; Mack v. Walker, 5 Cir., 1966, 372 F.2d 170, cert. den., 393 U.S. 1030, 89 S.Ct. 641, 21 L.Ed.2d 573; James v. United States, 5 Cir., 1969, 416 F.2d 467, cert. den., 397 U.S. 907, 90 S.Ct. 902, 25 L.Ed.2d 87
 
 
 [1]
 In which is raised as well the question whether the rule of a state law school requiring white students, solely on the basis of race, to meet higher admission standards than others violates 42 U.S.C. 2000d, which forbids discrimination on racial grounds in federally assisted activities