493 F.2d 614
 7 Fair Empl.Prac.Cas. 873, 7 Empl. Prac. Dec. P 9287
NAACP, Plaintiff, Phillip Paradise, Jr., Individually and on
behalf of the class similarly situated,
Intervenor-Appellee, United States of
America, Plaintiff and Amicus
Curiae-Appellee,
v.
Walter L. ALLEN, as Director of the Alabama Department of
Public Safety, his agents, assigns, etc., et al.,
Defendants-Appellants.
 No. 72-1796.
 United States Court of Appeals, Fifth Circuit.
 April 19, 1974.
 
 William J. Baxley, Atty. Gen., State of Ala., E. Ray Acton, Executive Asst. Atty. Gen., Gordon Madison, Asst. Atty. Gen., Montgomery, Ala., for appellants.
 Morris Dees, Jr., Joseph J. Levin, Jr., Ira DeMent, U.S. Atty., Montgomery Ala., David Norman, David L. Rose, Douglas B. Huron, Civil Rights Div., U.S. Dept. of Justice, Washington, D.C., for appellees.
 Before MORGAN, CLARK and INGRAHAM, Circuit Judges.
 CLARK, Circuit Judge:
 
 
 1
 This class action suit charging Walter L. Allen,[1] Director of the Alabama Department of Public Safety (DPS), and John S. Frazer, Director of the Alabama Department of Personnel, with unconstitutionally excluding Negroes from employment in the DPS was instituted by the National Association for the Advancement of Colored People (NAACP) on behalf of its members and all similarly situated blacks in the state of Alabama. The NAACP was joined in this cause by Phillip Paradise, Jr., who intervened individually and on behalf of the class, and by the United States, which was ordered by the district court to participate as a party and amicus curiae. At the trial the proof showed that the DPS employed 650 state troopers, 26 trooper cadets (men, too young to qualify as troopers, whom the department trains to become future troopers), and 279 support personnel (secretaries, clerks and technicians).[2] In addition, the patrol maintained an arm of approximately 500 auxiliary state troopers, unpaid volunteers selected by the DPS to assist mainline troopers in emergency situations. All but five DPS employees had been selected and hired under the Alabama merit system, as conceived and conducted by the Department of Personnel in concert with the DPS. In addition to its troopers, support personnel and auxiliary, the patrol employed five blacks as menial laborers.
 
 
 2
 Support personnel apply to and are selected by the Department of Personnel. Trooper and trooper cadet applicants, however, undergo an independent fivestep selection process. For recruiting new troopers and trooper cadets, the DPS relies primarily on informal channels and referrals from inside the patrol. Preliminary screening culls applicants who fail to meet basic height, weight and health requirements. The remaining applicants are ranked on an employment register according to their scores on a written examination and the results of an oral interview. The Department of Personnel then certifies the highest ranking applicants to the DPS, which investigates and selects new troopers from among those with 'clean' backgrounds.
 
 
 3
 The district judge found that the record reflected evidence of identifiable discriminatory practices at each stage of the employment selection process. Although the written test and oral interview disqualified blacks at a pronouncedly disproportionate rate, neither was validated to correlate successful scores with successful job performance. The plaintiffs also proved several instances of individual racial discrimination. Most importantly, the district court found that 'in the thirty-seven year history of the patrol there has never been a black trooper and the only Negroes ever employed by the department have been nonmerit system laborers.' Defendants demurred to the prima facie case made out by these statistics and to the trial court's conclusion that 'this unexplained and unexplainable discriminatory conduct by state officials is unquestionably a violation of the Fourteenth Amendment.' NAACP v. Allen, 340 F.Supp. 703, 705 (M.D.Ala.1972).
 
 
 4
 The district judge exercised his discretion to grant both mandatory and prohibitory injunctive relief as a means of ending racial discrimination in the patrol's employment policies and beginning eradication of its lingering effects. Although the patrol's unvalidated test and subjective interview procedure were left intact pending subsequent review, defendants were enjoined from engaging in any further discriminatory employment practices. In addition, the DPS was ordered to institute statewide recruitment and equal opportunity advertising programs directed especially at the plaintiff class and to submit periodic, written reports setting forth in detail the efforts undertaken to recruit and hire black troopers. Finally, the court affirmatively required the hiring and permanent employment of one qualified black trooper or support person for each white so hired until approximately 25% Of both the state trooper and support personnel force was comprised of blacks.[3]
 
 
 5
 Defendants do not attack the court's fact findings, rather they center their appellate attack on the propriety of the equitable relief entered below, contending that the quota hiring relief granted (1) results in unconstitutional discrimination against eligible white applicants-- thereby, at best, substituting one constitutional infirmity for another-- and (2) improperly requires the patrol to appoint less qualified blacks ahead of whites who have achieved higher test scores. Defendants also object to the award of attorneys' fees to plaintiffs. Because each of these contentions has been foreclosed by our recent en banc decision in Morrow v. Crisler, 491 F.2d 1053 (5th Cir. 1974), the judgment of the district court is affirmed.
 
 
 6
 The evidentiary record here was capable of but one tenable interpretation-- the existence of unconstitutional racial discrimination. With or without proof of the defendants' motives or intent, the present effect of past practices was clear. Indeed, defendants do not challenge the district court's finding that they 'have engaged in a blatant and continuous pattern and practice of discrimination in hiring in the Alabama Department of Public Safety, both as to troopers and supporting personnel.' 340 F.Supp. at 705. Thus, the district court's equitable obligations and responsibilities were patent. When the deprivation by state officials of rights secured to the plaintiff class by the equal protection clause of the Fourteenth Amendment is so clearly demonstrated, the federal chancellor has 'not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.' Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709, 715 (1965). 'The task is to correct, by a balancing of the individual and collective interests, the conditions that offend the Constitution.' Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554, 566 (1971). The scope of the district court's discretionary equitable powers is broad, and the nature of the relief it prescribes is inherently flexible. The remedy it decrees, however, must be feasible, workable, effective, Swann v. Charlotte-Mecklenburg Board of Education, supra, 402 U.S. at 32, 91 S.Ct. at 1283, and promise realistically to work and to work now. Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).
 
 
 7
 The nondiscretionary duty to bar all past and future discriminatroy practices is not the subject of this appeal. Defendants only object to the entry of 'affirmative hiring relief,' urging that the order conpels them to violate the Fourteenth Amendment rights of eligible white applicants by discriminating in favor of less qualified blacks, whose examination and interview scores resulted in a lower ranking on the personnel department's employment register. Defendants argue that the best hope for eliminating discrimination in public employment is through the established competitive merit system. Assuming, arguendo, that defendants have standing to assert the constitutional rights of presently certified and eligible or future white applicants, whatever doubts that may have existed about the constitutionality or availability of affirmative hiring relief as a legitimate weapon in the federal chancellor's arsenal of remedial instruments were erased by our decision in Morrow v. Crisler, supra.
 
 
 8
 In Morrow we overturned the district court's determination to withhold quota relief in the face of a supplemented appellate record furnishing hindsight proof that the lower court's prohibitory judgment had wholly failed to eliminate the pervasive effects of past racial discrimination. In the absence of validated, job-related qualifications and testing procedures and any minority recruiting initiatives by the Mississippi Highway Patrol, the trial judge's decree had the effect of prolonging the pre-existing discriminatory environment. Thus, even assuming that the unvalidated selection procedures of the past were neutrally applied, the court's failure to impose affirmative hiring relief itself contravened the Fourteenth Amendment since it operated to perpetuate constitutionally deficient employment practices and preserve the discriminatory status quo. Morrow established that this state of affairs mandated the entry of affirmative hiring relief, despite the fact that the district court had decided it was not necessary. A fortiori, the trial court's exercise of discretion to impose such relief in the nearly identical circumstances here was permissible.
 
 
 9
 Since no decision has adequately rationalized the constitutional problems raised by affirmative hiring relief, we now undertake that task within the factual matrix presented by this case. At the outset, it is apparent that no applicant for public employment can base any claim of right under the Fourteenth Amendment's equal protection or due process clauses upon an eligibility ranking which results from unvalidated selection procedures that have been shown to disqualify blacks at a disproportionate rate. This is so because by definition such criteria have not been shown to be predictive of successful job performance. Hence, there is no reliable way to know that any accepted applicant is truly better qualified than others who have been rejected. Until the selection procedures used by the defendants here have been properly validated, it is illogical to argue that quota hiring produces unconstitutional 'reverse' discrimination, or a lowering of employment standards, or the appointment of less or unqualified persons.
 
 
 10
 The Constitution is not an actionable, written guarantee to any minority class that it will receive proportionate representation in public employment. Rather, that 'color blind' document underwrites only the ideal: an equal opportunity of access to employment in public agencies whose hiring practices are based solely on merit. No individual possesses a constitutional right to public employment,[4] and it is not the purpose of quota relief to require that anyone who lacks job-related qualifications be employed. However, the 'color conscious' relief which we affirm does require that the defendants temporarily institute race as the final determinative factor in their appointment of applicants to fill new openings on the patrol and its supporting staff. It is clearly contemplated, moreover, that the affirmative hiring procedure required could compel the defendants to employ a less qualified white ahead of a more qualified black applicant if the last person hired by the patrol was black and vice versa. This utilization of race, although a suspect classification which triggers the most rigorous judicial scrutiny, see, e.g., Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), has never been held to be per se unconstitutional.
 
 
 11
 Just as . . . race . . . must be considered in determining whether a constitutional violation has occurred, so also must race be considered in formulating a remedy . . .. As we have held in Swann, the Constitution does not compel any particular degree of racial balance or mixing, but when past and continuing constitutional violations are found, some ratios are likely to be useful starting points in shaping a remedy. An absolute prohibition against use of such a device-- even as a starting point-- contravenes the implicit command of Green v. County School Board, . . . (supra), that all reasonable methods be available to formulate an effective remedy.
 
 
 12
 Board of Education v. Swann, 402 U.S. 43, 46, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586, 589 (1971).[5]
 
 
 13
 In the absence of an invidious purpose, a determination of unconstitutionality here would be clearly unwarranted. Even assuming for the purposes of argument, that action of a state official taken pursuant to a compulsory federal judicial order constitutes state action, the affirmative hiring relief instituted sub judice fails to transgress either the letter or the spirit of the Fourteenth Amendment. Presuming further, that the federal chancellor's discretion should be subjected to the stringent compelling governmental interest test, the decree passes constitutional muster.[6] No one is denied any right conferred by the Constitution. It is the collective interest, governmental as well as social, in effectively ending unconstitutional racial discrimination, that justifies temporary, carefully circumscribed resort to racial criteria, whenever the chancellor determines that it represents the only rational, nonarbitrary means of eradicating past evils.
 
 
 14
 Although our decision in Morrow was without direct precedent in this circuit, our action was by no means lacking in decisional support. indeed, affirmative equitable relief grounded on the use of numerical racial ratios has been increasingly utilized by federal courts to eradicate the continuing effects of past discrimination. In the context of desegregating public schools, the Supreme Court has sanctioned the use of 'mathematical ratios' as a 'useful starting point in shaping a remedy to correct past unconstitutional violations.' Swann v. Charlotte-Mecklenburg Board of Education, supra, 402 U.S. at 25, 91 S.Ct. at 1280. Such relief has been specifically approved in employment discrimination litigation brought under Title VII[7] of the Civil Rights Act of 1964 and the Philadelphia Plan and other similar programs, which have been instituted pursuant to Executive Order.[8] Most significant, however, is the judicial imprimatur of our sister circuits on the entry of quota relief against public agencies that have engaged in employment practices shown to be violative of the Fourteenth Amendment.[9] In numerous other cases this circuit has ordered various types of affirmative relief to eradicate racial discrimination through 'race conscious means.'[10] Until the Supreme Court issues a definitive ruling on this question,[11] Morrow and the over-whelming weight of judicial authority have conclusively established that appellate review of quota hiring is limited to whether the imposition of such relief in a given situation constitutes an abuse of the federal chancellor's discretion.
 
 
 15
 Because of the limited nature of our present interim review, the fact that injunctive decrees operate prospectively only and should be considered on the freshest record possible, and the long interlude between oral argument in the cause sub judice and our en banc decision in Morrow (for which we waited), we sua sponte requested the parties to supplement the record on appeal with current employment data from the DPS. In addition, we accorded the district court an opportunity to reconsider any portion of its decree in the light of the newly adduced information. Upon receipt of this supplementation, that court declined to make any changes in its decree pending the final outcome of this appeal. A careful review of the record, as supplemented, demonstrates to us that the same factors which necessitated affirmative hiring relief in Morrow are also present and justify its imposition here.
 
 
 16
 As in Morrow, the district court was confronted with (1) clear evidence of a long history of intentional racial discrimination, (2) a paucity, if not a total absence of any positive efforts by the patrol to recruit minority personnel and (3) utilization of unvalidated employment criteria and selection procedures and other discriminatory practices. On this record, therefore, the conclusion of the district judge that quota relief was essential to make meaningful progress towards eliminating the unconstitutional practices and to overcome the patrol's thirty-seven year reputation as an all-white organization is supported by fact and law. The supplemental record here provides an unusual confirmation of the feasibility, wisdom and efficacy of the decree. Since issuance of the injunction order the DPS has only appointed 50 troopers and 25 of these have been black. Eighty black support personnel have now been employed where before there were none. Although the judgment rendered in United States v. Frazer, supra, enjoined discriminatory practices in the Department of Personnel, no Negroes were hired in DPS support positions until the Allen court ordered affirmative relief 18 months later. Moreover, the fact that approximately 325 blacks have passed the qualifying examination for state trooper and been placed on the employment register negates the patrol's contention that qualified, interested black applicants are unavailable. It bears emphasis that the quota relief ordered is only temporary; whenh blacks, who qualify under the prevailing standards for all troopers, comprise 25% Of patrol personnel the affirmative hiring relief automatically terminates and only neutral employment practices will thereafter be required. Again the supplementary record shows that this goal is not unrealistic. It is also significant that the hiring qualifications defined by the DPS will not have been compromised pending the contemplated validation studies.
 
 
 17
 Finally, but perhaps the most crucial consideration in our view is that this is not a private employer and not simply an exercise in providing minorities with equal opportunity employment. This is a police department and the visibility of the Black patrolman in the community is a decided advantage for all segments of the public at a time when racial divisiveness is plaguing law enforcement.
 
 
 18
 Bridgeport Guardians, Inc. v. Bridgeport Civil Service Commission, supra, 482 F.2d at 1341; see Carter v. Gallagher, supra, 452 F.2d at 331.
 
 
 19
 In conclusion we would note that this extraordinary remedy is not without its limitations. The use of quota relief in employment discrimination cases is bottomed on the chancellor's duty to eradicate the continuing effects of past unlawful practices. By mandating the hiring of those who have been the object of discrimination, quota relief promptly operates to change the outward and visible signs of yesterday's racial distinctions and thus, to provide an impetus to the process of dismantling the barriers, psychological or otherwise, erected by past practices. It is a temporary remedy that seeks to spend itself as promptly as it can by creating a climate in which objective, neutral employment criteria can successfully operate to select public employees solely on the basis of job-related merit. For once an environment where merit can prevail exists, equality of access satisfies the demand of the Constitution.
 
 
 20
 We again caveat that quota relief does not seek to confer proportional representation in public employment upon any minority or identifiable ethnic group, and that no individual or group has a right to be represented in any particular public program or body. The Constitution only warrants the right of equal availability to and even-handed dispensation of public benefits. Traditional concepts of comity and judicial restraint must also guide the discretion which chooses to use the drastic remedy of quota hiring. It is a form of relief which should be reserved for those situations in which less restrictive means have failed or in which the chancellor could reasonably foresee that they would fail. It was in this context that the Morrow court stated:
 
 
 21
 The duration of the affirmative hiring relief shall be determined by the District Court. When it is convinced that the measures undertaken by the Patrol effectively offset the effects of past discrimination, such affirmative hiring relief can be terminated. It is not required that the proportion of blacks on the Patrol mirror the proportion of blacks in the population. However, in view of the protracted and pervasive discrimination practiced by the Department and the inefficacy of the prior decree in producing a more integrated Patrol, the burden will be upon the Patrol to prove that the residual effect of past discrimination has in fact been eliminated. Moreover, prior to the cessation of affirmative hiring programs, where any black individual challenges the Patrol's refusal to employ him, the Patrol must show that such refusal was for legitimate job related reasons.
 
 
 22
 Morrow v. Crisler, supra, 491 F.2d at 1056.[12]
 
 
 23
 It is not the function of this court or the tribunal below to supervise the operation of the Alabama Department of Public Safety. Within constitutional and statutory limits such matters are within the province of the state government officials. 'The sole obligation of the court is to insure that, in the formulation and implementation of policies and procedures for the hiring and promotion of . . . (state troopers), constitutional and statutory limitations are not violated.' Pennsylvania v. O'Neill, 349 F.Supp. 1084, 1102 (E.D.Pa.1972), aff'd in pertinent part by an equally divided court, 473 F.2d 1029 (3d Cir. 1973) (en banc). The District Judge felt that 'in light of the affirmative relief . . . required, primary concern over the testing procedures is unnecessary,' thus he was 'not inclined to order new tests or testing procedures' due to the time (possibly four or five years) and expense (perhaps 40,000 dollars) involved. 340 F.Supp. at 706. In Morrow v. Crisler, supra, our mandate included an instruction that the district court, as an essential adjunct to the entry of affirmative hiring relief, also insure the application by the Mississippi Highway Patrol of objective, racially neutral, job-related and validated employment criteria and testing procedures. In the present cause, the validity of DPS examination criteria never became an issue because the defendants made no effort to meet their burden of justifying the unvalidated procedures. It may well be that the lower court would require validated testing when the cause is reconsidered. The patrol's unvalidated employment selection qualifications and procedures constitute a crucial element that is critically interrelated to the unconstitutional employment practices attributed to the defendants. The federal chancellor has the nondiscretionary duty to end all discriminatory practices, past, present and future. To dliminate any doubt, we require that such relief be granted as is necessary to insure the utilization of objective job-related criteria. The precise form of the decree is for the determination of the district judge. Of course, 'the touchstone is business necessity' and any test applied must be 'shown to bear a demonstrable relationship to successful performance of the jobs for which it is used.' Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158, 164 (1971). See e.g., Bridgeport Guardians, Inc. v. Bridgeport Civil Service Comm'n, supra; Castro v. Beecher, supra; see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 n. 14, 93 S.Ct. 1817, 1824 n. 14, 36 L.Ed.2d 668, 678 n. 14 (1973).
 
 
 24
 The district court did not abuse its discretion in awarding attorneys' fees to plaintiffs. See Morrow v. Crisler, supra; Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974).
 
 
 25
 The decision of the district court is affirmed and the cause is remanded for further action not inconsistent with this opinion.
 
 
 26
 Affirmed and remanded.
 
 
 
 [1]
 Eldred C. Dothard, successor in office to defendant Allen, was substituted as a defendant pursuant to Fed.R.Civ.P. 25(d)
 
 
 [2]
 The Department of Personnel, which has been subject since July 28, 1970 to the order entered by the same district court in United States v. Frazer, 317 F.Supp. 1079 (M.D.Ala.1970), administers the Alabama merit system and supplies the DPS with its support personnel. The Frazer court enjoined the Department of Personnel and its employees from engaging in any discriminatory practices, but only specified an affirmative minority hiring goal for temporary state employees. Because the DPS support personnel are obtained from defendant Frazer's department, the Allen court treated the appropriate relief for those persons as a motion for supplemental relief in Frazer. 340 F.Supp. at 705
 
 
 [3]
 The court also decreed that defendants were prohibited from conducting any training courses for new troopers unless filled by approximately 25% Black trooper candidates. According to the 1970 census, 26.2% Of the Alabama population is Negro
 
 
 [4]
 Bridgeport Guardians, Inc. v. Bridgeport Civil Service Comm'n, 482 F.2d 1333, 1337 (2d Cir. 1973); see San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 29-34, 93 S.Ct. 1278, 1295-1297, 36 L.Ed.2d 16, 40-44 (1973) ('It is not the province of this court to create substantive constitutional rights in the name of graranteeing equla protection of the laws.'); Gunther, Foreword: In Search of Evolving Eoctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1, 8-14 (1972)
 
 
 [5]
 See also Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 931-932 (2d Cir. 1968)
 What we have said may require classification by race. That is something the Constitution usually forbids, not because it is inevitably an impermissible classification, but because it is one which usually, to our national shame, has been drawn for the purpose of maintaining racial inequality. Where it is drawn for the purpose of achieving equality it will be allowed, and to the extent it is necessary to avoid unequal treatment by race, it will be required.
 
 
 [6]
 'Although 'the Fifth Amendment contains no equ7l protection clause, it does forbid discrimination that is 'so unjustifiable as to be violative of due process." Schneider v. Rusk, 377 U.S. 163, 168, 84 S.Ct. 1187, 12 L.Ed.2d 218; see Frontiero v. Richardson, 411 U.S. 677, 680 n. 5, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); Shapiro v. Thompson, 394 U.S. 618, 641-642, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). Thus, if a classification would be invalid under the Equal Protection Clause of the Fourteenth Amendment, it is also inconsistent with the due process requirement of the Fifth Amendment. See Richardson v. Belcher, 404 U.S. 78, 81, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971).'
 Johnson v. Robison, U.S. , n. 4, 94 S.Ct. 1160, 1164, 39 L.Ed.2d 389, 396 (1974).
 
 
 [7]
 See, e.g., United States v. N.L. Industries, Inc., 479 F.2d 354 (8th Cir. 1973); United States v. IBEW Local No. 212, 472 F.2d 634 (6th Cir. 1973); United States v. Wood Lathers Local No. 46, 471 F.2d 408 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973); United States v. Carpenters Local No. 169, 457 F.2d 210 (7th Cir.), cert. denied, 409 U.S. 851, 93 S.Ct. 63, 34 L.Ed.2d 94 (1972); United States v. Ironworkers Local No. 86, 443 F.2d 544 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); United States v. IBEW Local No. 38, 428 F.2d 144 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970); Asbestos Workers Local No. 53 v. Vorgle, 407 F.2d 1047 (5th Cir. 1969)
 In addition, we note that Congress recently amended Title VII to include state agencies within the statute's parameters. Pub.L. No. 92-261, 2(1), (3), (5), 86 Stat. 103, amending 42 U.S.C. 2000e (Supp.1973).
 
 
 [8]
 see, e.g., Southern Illinois Builders Association v. Ogilvie, 471 F.2d 680 (7th Cir. 1972); Contractors Association v. Shultz, 442 F.2d 159 (3d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); Joyce V. McCrane, 320 F.Supp. 1284 (D.N.J.1970); see also Associated General Contractors v. Altshuler, 490 F.2d 9 (1st Cir. 1973)
 
 
 [9]
 See e.g., Vulcan Society v. Civil Service Commission, 490 F.2d 387 (2d Cir. 1973); Bridgeport Guardians, Inc. v. Bridgeport Civil Service Commission 482 F.2d 1333 (2d Cir. 1973); Pennsylvania v. O'Neill, 473 F.2d 1029 (3d Cir. 1973) (en banc); Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972); Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971) (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); but see Harper v. Kloster, 486 F.2d 1134 (4th Cir. (1973)
 
 
 [10]
 See Morrow v. Crisler, supra, 491 F.2d at 1057 (Brown, C.J., concurring)
 
 
 [11]
 Cf. Defunis v. Odegaard, 82 Wash.2d 11, 507 P.2d 1169 (1973), cert. granted, 414 U.S. 1038, 94 S.Ct. 538, 38 L.Ed.2d 329 (1973)
 
 
 [12]
 The problems inherent in quota relief assume different parameters in the promotion, rather than hiring, context. See Bridgeport Guardians, Inc. v. Bridgeport civil Service Comm'n, supra; Pennsylvania v. O'Neill, supra. We deal here solely with hiring and expressly pretermit any intimation of a position as to promotion practices. See also Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364 (5th Cir. 1974); United States v. Georgia Power Co., 474 F.2d 906 (5th Cir. 1973)