**John GERMANN et al., Plaintiffs,**

v.

**Robert KIPP et al., Defendants.**

**No. 76CV0036–W–4.**

United States District Court,
W. D. Missouri, W. D.

April 7, 1977.

---

Lawrence F. Gepford, Gepford, Sears, Matula, Alena & Riederer, Kansas City, Mo., for plaintiffs.

Dan G. Jackson, III, Asst. City Atty., Kansas City, Mo., for defendants.

## MEMORANDUM AND ORDER

### ELMO B. HUNTER, District Judge.

■ Plaintiffs allege "reverse discrimination" in seeking an Order of this Court to enjoin defendants from making certain promotions within the Fire Department of Kansas City, Missouri, under the procedures established for implementing that department's affirmative action plan. Jurisdiction is established under the Civil Rights Act of 1870, 42 U.S.C. § 1981, and 28 U.S.C. § 1343.[1] No claim for monetary damages is presented in this case.

The named plaintiffs are employees of the Fire Department of Kansas City, Missouri, and Local 42, International Association of Fire Fighters, AFL-CIO (the Union). Plaintiffs Germann and Riley are President and Secretary, respectively, of Local 42, and all individual plaintiffs are members of the Union. Plaintiffs seek to represent a class consisting of all fire fighters employed by the City of Kansas City, Missouri. Defendant City of Kansas City is a constitutionally chartered municipal corporation of the State of Missouri, exercising sovereignty over its citizens pursuant to the provisions of Article VI, § 19 of the Constitution of Missouri. Other defendants are the City Manager of Kansas City, Missouri; the Director of the Fire Department; the Fire Chief; and the Director of Personnel of Kansas City, Missouri.

### I. The Disputed Personnel Procedures

City employees are classified by Sections 113, 114 and 115 of the City Charter into the "unclassified" service and "classified" service. All members of the Fire Department are within the classified service with the exception of the Director of Fire. All plaintiffs herein are members of Division "A" of the classified service, which division includes all positions and employments for which it is practicable to determine the merit and fitness of applicants by examination.

The Charter provides that the City shall operate under a system popularly known as the "merit system." Under the provisions of the Charter, defendant Lewinsohn, Director of Personnel, is required to administer examinations to determine the relative fitness of applicants for city employment. After the appropriate tests, the applicants are placed in order of rank on eligibility lists; in determining the rankings, test score on the job-related achievement test counts 75% and seniority counts 25%.[2] No other factors are utilized to construct promotional lists within the Fire Department. Pursuant to Section 123 of the Charter, an eligibility list is current for not more than two years.

Provisions for filling vacancies from the eligible lists are found in §§ 119 and 121 of the Charter. Section 119, entitled "Appointments," provides:

When any position in the classified service is to be filled, the appointing authority shall notify the personnel director of that fact and the personnel director, after notice to the persons to be certified, shall certify to such authority the names and addresses of candidates on the eligible list for the class or grade to which such position belongs as follows:

(a) For position in division "A" . . . five (5) names of persons having highest ratings on the eligible list, plus two additional names with next highest ratings for each similar position to be filled if more than one. . . .

---

1. Although not binding on the Court, the parties have stipulated that jurisdiction exists under § 1981. Plaintiffs also have alleged jurisdiction under other civil rights statutes, namely, 42 U.S.C. §§ 1983 and 1985, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5. Because plaintiffs have failed to exhaust their administrative remedies jurisdiction is lacking under Title VII. Since jurisdiction clearly exists under § 1981, other alleged bases of jurisdiction need not be considered.

2. The allowance of extra raw score preferment on the basis of seniority is unique to the Fire Department, having been negotiated by the City and the Union beginning January 28, 1970, and continuing through the present.

The appointing authority shall appoint to such position one of the persons whose names are so certified except as otherwise provided in this charter. . . .

Section 121, entitled "Promotions," provides:

Whenever practicable, as determined by the head of the department in which a vacancy occurs, vacancies in the classified service shall be filled by promotion. Any advancement in rank shall constitute promotion. When any position in the classified service which may be filled by promotion is to be filled, the appointing authority shall notify the personnel director of that fact, and the personnel director shall certify to such authority the names and addresses of employees of the city who are candidates on the eligible list for the class or rank to which such position belongs, in the order of rating, which list shall be known as the promotional list. *Any appointment from such list of a city employee whose name is not among the five (5) highest in rating on such promotional list, if any, shall be made by the appointing authority only after proper approval thereof, in writing, by the director of personnel.* (Emphasis supplied.) [3]

On April 28, 1972, the City Council of Kansas City, Missouri, adopted Ordinance No. 41120, amending the Administrative Code of Kansas City, Missouri, adopting for the City the principle of affirmative action in equal opportunity employment, and authorizing the Director of Personnel and the Director of Human Relations jointly to promulgate rules and regulations relating to the administration and enforcement of the affirmative action program. Ordinance No. 42406 formally approved and adopted the affirmative action program promulgated by the Director of Personnel and the Director of Human Relations.[4]

Under the adopted affirmative action plan an annual review is conducted of each department's staff to identify areas of deficiency in the utilization of minorities and women with particular emphasis on supervisory, skilled, technical, professional and management positions.[5] When vacancies occur within a department in positions which have been identified by the above procedure as underutilizing women, or minorities, the department head's requisitions to the Personnel Department to fill those positions are marked "Affirmative Action" unless accompanied by a memorandum to the Personnel Director from the department head stating the reasons for the position being removed from the affirmative action effort. Upon receipt of a requisition marked "Affirmative Action," the Person-

---

**3.** Sections 119 and 121 of the City Charter of Kansas City, Missouri, were interpreted by the Missouri Court of Appeals, Kansas City District, in *State v. Hendrix,* 424 S.W.2d 771 (Mo. App.1968). There, where two Battalion Chiefs in the Fire Department sought an alternative writ of mandamus in connection with the manner of filling a vacancy in the office of Deputy Chief of the Fire Department, the court held that the promotion list under Section 121 shall consist of the names of all city employees on the eligible list regardless of number, and that the number accordingly may be more than five or less than five despite the provision of Section 119 for certification of five names.

**4.** The rationale for the program is set forth in the text of the Ordinance as follows: "WHEREAS, the merit system as set forth in the Charter has as its basic principle the affording of equal employment opportunity; and WHEREAS, notwithstanding the City's prior efforts to assure nondiscrimination, imbalances may have developed in the utilization of minor-

ities and women in certain areas of City employment which require an affirmative effort to correct; and WHEREAS, in Ordinance No. 41120 the City of Kansas City adopted the principle of an affirmative action program for City government and directed that such a program be developed by the Directors of Personnel and Human Relations. . . ."

**5.** Goals are established annually on the basis of comparison between the representation of minorities and women in a particular job classification within a particular division of a department and the availability of that grouping within the labor market and within the population of the standard statistical metropolitan area. In determining affirmative action goals for the Fire Department, the Human Relations Department of the City identified the minority population of Kansas City, Missouri, as 22.9% of the total population. Affirmative action guidelines of the office of Federal Contract Compliance also were utilized in establishing the goals and timetables.

nel Department will review any existing certification list for that position to determine whether or not there is a good representation of minorities and women on the existing list, taking into consideration the availability of minorities and women in the labor market relative to that particular position. If there is a good representation, the list will be forwarded to the appointing authority in the usual manner. If there is not a good representation of minorities and women on the existing list, the Personnel Department will begin immediately to conduct intensive recruiting of women and minorities and to administer appropriate tests. There never has been any judgment by any court or determination by any administrative agency, that these appointment and promotional practices and policies of Kansas City, Missouri, or those in particular of the Fire Department of Kansas City, Missouri, are in any way discriminatory or in violation of Title VII of the Civil Rights Act of 1964, as amended, or applicable federal executive orders.

## II. The Disputed Promotions

In January of 1976, defendant Spink, Director of the Fire Department, purportedly acting under the above procedures, promoted two Fire Captains from the promotional certification list to the position of Battalion Chief; those two individuals, both members of minority groups, were ranked second and tenth on the certification list. Also promoted at that time, to the position of Fire Captain, were three Fire Apparatus Operators, all members of minority groups, who ranked 41st, 47th and 50th on the certification list for the position of Fire Captain.

Plaintiffs filed this action immediately, seeking a temporary restraining order to prevent the five promotions. When the promotions subsequently were refused by each of the minority individuals to be promoted, plaintiffs did not pursue efforts to obtain a temporary restraining order, but filed an amended complaint and continued to assert their claims for injunctive relief against the making of promotions within the Fire Department on any basis other than the merit system as it had been employed prior to the imposition of affirmative action requirements.

On July 26, 1976, the Fire Department sent to the Personnel Department requisitions numbered 994, 995, 996 and 997, identifying four vacancies in the position of Battalion Chief and requesting a certification list from which to make the appointments. Requisitions numbered 994 and 995 were earmarked "Affirmative Action." On July 29, 1976, the Personnel Department furnished the Fire Department a certification list, listing all the Fire Captains eligible for promotion to Battalion Chief in rank order. On August 6, 1976, defendant Spink sought and received the approval of defendant Lewinsohn, Director of Personnel, for appointment of Captain Arnett Williams, Number Ten on the eligible and certification lists.[6] On August 9, 1976, defendant Spink and Louis H. Hansen, Acting Fire Chief, appointed four Fire Captains to the rank of Battalion Chief, to be effective at 12:01 a.m. on August 16, 1976. Three of the Fire Captains appointed are members of minority groups.[7] On the original certification list Captain Lloyd Raymond Willard ranked second, Captain Billie D. Booth

6. Chapter 121 of the City Charter requires written approval of the Personnel Director for a promotion outside the top five names on the certification list. No criteria for granting approval is specified by the Charter, and defendant Lewinsohn has stated that his justification was "affirmative action." Thus there is no question that approval for the appointment of Arnett Williams was provided on the basis of his race. Under the provisions of the Charter, no approval was required for the appointment of Captains Willard and Booth, who ranked second and fifth, respectively, on the certification list. Although Captain Hogan ranked

eighth on the original list, the City contends that the appointments of Captains Willard and Booth from the rankings above Hogan elevated him to the position of sixth on the list. Although it appears that written approval should have been obtained for the appointment of Captain Hogan under Chapter 121 of the Charter, no such approval was obtained. Nevertheless, Captain Hogan is a Caucasian, plaintiffs do not contest his appointment, and that issue is not specifically before the Court in this case.

7. Captain Willard is an American Indian; Captains Booth and Williams are Negroes.

ranked fifth, Captain James Shelton Hogan ranked eighth, and Captain Arnett Reginald Williams ranked tenth.[8] The four Fire Captains were sworn in as Battalion Chiefs at 8:00 a.m. on August 13, 1976, and assumed their new rank and position August 16, 1976.[9] The Court accepted this action as fully and finally submitted following an evidentiary hearing on March 30, 1977.

### III. Standing

■ Of the twenty-three named plaintiffs, five individuals clearly have standing to maintain this action. The United States Supreme Court has established that in order to obtain standing, a plaintiff must allege that he has suffered injury in fact, economic or otherwise, and that the injury he suffers is to an interest arguably within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question. *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

■ Plaintiffs Tvedten, McDonald, Stevinin, Friends, and Whitehead, who held the ranks 1, 3, 4, 6, and 7, respectively, on the certification list for Battalion Chief when the four promotions to that position were made, do meet the two-pronged test of standing in this case. Each of them certainly can argue that they were injured in fact when they were "passed over" for an individual ranking lower on the list. Plaintiffs Willard and Williams, however, lack standing precisely because they were not passed over and thus have not been injured in fact. As two of the four individuals promoted to the position of Battalion Chief, who have accepted their promotions and assumed the duties and benefits of their new positions, they may not now complain of their own promotion. None of the other individual plaintiffs were on the certification list or the eligibility list for the position of Battalion Chief; because they were not qualified for that promotion, they were not injured by the promotion of others who were qualified, and may not bring an action to enjoin those promotions. Nor do plaintiffs Germann and Riley, President and Secretary of Local 42, International Association of Fire Fighters, AFL-CIO, have standing to assert the claims of others concerning the Battalion Chief promotions in their capacity as officers of Local 42. *Tileston v. Ullman,* 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943). See *Elk Grove Fire Fighters Local No. 2340 v. Willis,* 391 F.Supp. 487 (N.D.Ill.1975). Having found that five individual plaintiffs have standing to maintain this action, it is not necessary to consider whether the Union separately, or those individuals on the certification list for the position of Fire Captain, satisfy the standing requirements. Accordingly no opinion is expressed in that regard.[10]

---

8. At an informal conference with the Court, held on August 12, 1976, the Court ordered that for purposes of the issues presented in this litigation, the "status quo" of the parties as of 2:00 p.m. on August 10, 1976, would be maintained, and that the ministerial acts of swearing in the four new Battalion Chiefs on August 13, 1976, and their assuming their positions on August 16, 1976, would not place defendants in contempt of the Court's Order. Thus, defendants have carried out Fire Department business by filling vacancies in the position of Battalion Chief without changing the equities of the situation which must be viewed by the Court in ruling on plaintiffs' request for injunctive relief.

9. Following the August promotion of the four Battalion Chiefs, the parties agreed that no further promotions would be made at any rank pending the outcome of this action. Since the aborted attempt in January 1976 to fill vacancies in the position of Fire Captain, no further promotions have been made in that position, although the parties have stipulated that unless enjoined, defendant City of Kansas City, through its duly appointed officials and pursuant to its current affirmative action plan, will promote and appoint to the rank of Fire Captain three minority Fire Apparatus Operators— John Ortega, No. 43 on the certification list, James Toliver, No. 49, and Jerry Brooks, No. 52.

10. For purposes of determining the merits of this action, the issue is the same whether raised by the facts surrounding the challenged

## IV. The Class Issue

■ Plaintiffs have not specified which subsection of Rule 23 of the Federal Rules of Civil Procedure they believe applicable to the facts of this case. This Court is of the opinion, however, that certification of a class, under any provision of Rule 23, is inappropriate under the circumstances presented herein. It is not at all clear that all fire fighters employed by the City of Kansas City, Missouri, possess claims, if any, which plaintiffs assert in this proceeding. To the contrary, among the fire fighters of Kansas City, Missouri, are many members of the minority groups benefitted by the City's affirmative action plan, who presumably have interests diametrically opposed to those which plaintiffs assert. Accordingly, plaintiffs have not demonstrated the prerequisites set forth in Rule 23 for maintenance of a class action, and this action will proceed solely on the claims of the individual plaintiffs, rather than on behalf of a class consisting of all fire fighters employed by the City of Kansas City, Missouri.

## V. The Question of Discrimination

Plaintiffs contend that they are victims of racial discrimination, and that defendants have violated their rights as secured by the Fourteenth Amendment to the United States Constitution as well as by the Civil Rights Statutes of the United States.[11] Defendants assert that all actions taken by them were solely within the scope of their duties as officials of the City of Kansas City, Missouri, in compliance with the City Charter and duly-enacted ordinances adopted in accordance with Executive Order No. 11246 [12] and Revised Order No. 4 of the United States Department of Labor.[13]

promotions to Battalion Chief or the intended promotions to Fire Captain. Accordingly, in view of the Court's finding that at least five of the plaintiffs have standing to maintain this action with respect to the position of Battalion Chief, and in order to simplify the recitation of the factual situation herein, the Court will not consider the additional facts relative to the position of Fire Captain. The determination of the issue with respect to that position will apply equally to all positions within the Fire Department.

There is, of course, no question of the Union's *capacity* to sue. Although it is an unincorporated association, it seeks to enforce a substantive right existing under the Constitution or laws of the United States, and capacity accordingly is afforded under Rule 17(b), F.R. Civ.P. It is worth note, however, that were the Union the only plaintiff in this proceeding, it would be questionable whether it had standing to maintain this action; that is, whether it had suffered injury in fact and, if so, whether that injury were within the zone of interest protected by § 1981. Plaintiffs have made no assertion whatsoever concerning the manner in which the Union may be injured; the only manner which comes immediately to mind is the injury which affirmative action may inflict upon the Union's seniority system. Where, as here, however, both those promoted and those "passed over" are members of the Union, it is difficult to say with certainty that the Union has the personal stake and interest sufficient to assure that concrete adverseness required by Article III of the Constitution. As of July 9, 1976, when a new Memorandum of Understanding was executed by the City of Kansas City and the Union, the Union no longer is recognized as the bargaining representative for "supervisors," including Battalion Chiefs. Thus, with respect to the position of Battalion Chief, the standing of the Union to challenge promotions is substantially in doubt. See *Germann v. City of Kansas City*, Mo., No. CV 76–3303, (16th Jud.Cir.Ct., Jackson County, Mo., Mar. 31, 1977).

**11.** Plaintiffs contend generally that defendants should be enjoined from making appointments and promotions under any system other than the merit system set forth in the City Charter. They make the further assertion that defendants' past *practice* of making appointments and promotions solely in rank order from the top of the certification list has bound defendants from departing from that procedure. Plaintiffs urge that defendants' practice, in effect, has amended the merit system by providing a more stringent requirement for the selection process.

**12.** 3 C.F.R. § 339. In 1965, President Lyndon B. Johnson proclaimed Executive Order No. 11246, declaring as a matter of public policy that "affirmative action be taken to rectify discrimination against minorities" and providing that all federal contractors agree not to discriminate against any employee or applicant for employment because of race, color, religion, or national origin. Executive Order 11375, effective October 1968, supplemented the earlier order by forbidding discrimination by federal contractors on the basis of sex.

**13.** Pursuant to its rule-making authority, the Department of Labor on February 5, 1970, issued Order No. 4, which required each federal contractor to develop a written affirmative ac-

Thus, in a manner of speaking, both plaintiffs and defendants base their arguments upon the equal protection clause of the Fourteenth Amendment and the statutes, regulations and Executive Orders flowing therefrom.

The clear and central purpose of the Fourteenth Amendment was to eliminate invidious racial discrimination, *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and the consideration of race as a measure of an applicant's qualification normally introduces a capricious and irrelevant factor working an invidious discrimination. *Anderson v. Martin,* 375 U.S. 399, 402, 84 S.Ct. 454, 11 L.Ed.2d 430 (1964); *Loving v. Virginia,* 388 U.S. 1, 10, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Harper v. Virginia Board of Elections,* 383 U.S. 663, 668, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). Once race is a starting point, courts are immediately embroiled in competing claims of different racial and ethnic groups that make difficult the development of manageable standards consistent with the equal protection clause. This Court's analysis will begin with the realization that the competing interests asserted in this case cannot be reconciled with each other and with the Fourteenth Amendment unless cultural standards of a diverse, rather than a homogeneous, society are taken into account. See Douglas, J., dissenting, in *DeFunis v. Odegaard,* 416 U.S. 312, at 334, 94 S.Ct. 1704, 40 L.Ed.2d 164; *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444, 469 (1976).

Plaintiffs rely upon the case of *McDonald v. Santa Fe Transportation Company,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), in which the United States Supreme Court recently stated that § 1981 is available as a basis for relief for whites who have been discriminated against in employment on account of race. In that case, where two white employees of a transportation company were discharged for misappropriating cargo from one of the company's shipments while a black employee charged with the same offense was not discharged, the Supreme Court noted that the language of § 1981 expressly protects *"all* persons" in the exercise of their civil rights, and examined the legislative history of the statute in reaching its conclusion that "the 1866 statute, designed to protect the 'same right . . . to make and enforce contracts' of 'citizens of every race and color' was not understood or intended to be reduced . . . to the protection solely of nonwhites. Rather, the Act was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race." *Id.* See also *Carter v. Gallagher,* 452 F.2d 315, 325 (8th Cir. en banc 1971).

The distinction between *McDonald* and the present case is that the conduct which gives rise to this action is the result of a good faith attempt to comply with the provisions of an "affirmative action" plan instituted to remedy the effects—although unadmitted and unintentional—of past discrimination against women and members of minority groups. To say that § 1981 may provide a remedy for white employees under the facts presented in *McDonald* does not answer the question of whether an employer who attempts to remedy past discrimination by taking affirmative action to employ women and minorities thereby violates the rights of white employees so as to entitle them to enjoin operation of the affirmative action program.

The United States Supreme Court has not yet directly addressed the constitutional problems raised by affirmative action relief.[14] Cf. *DeFunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974). The absence of explicit direction from the

---

tion program. Revised Order No. 4, 41 C.F.R. 60–2 (1971), imposed additional and more specific compliance requirements.

**14.** Although this Court is aware that the Supreme Court has accepted certiorari in the case of *Bakke v. Regents of University of California,*

18 Cal.3d 34, 132 Cal.Rptr. 680, 553 P.2d 1152 (Cal.1976), and that a decision on the issue of "reverse discrimination" therefore is forthcoming, the circumstances presented in the present case mandate that a decision herein not be postponed pending the outcome of the *Bakke* decision.

Supreme Court does not leave this Court directionless, for the courts, the Congress, and government agencies heretofore have recognized that it may not be possible to achieve equality of opportunity simply by applying neutral principles.[15] The utilization of race, although a suspect classification which triggers the most rigorous judicial scrutiny, see, e. g., *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), has never been held to be *per se* unconstitutional. On the contrary, the United States Supreme Court has recognized that "just as . . . race . . . must be considered in determining whether a constitutional violation has occurred, so also must race be considered in formulating a remedy." *Bd. of Educ. v. Swann*, 402 U.S. 43, 46, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971). Viewed in a constitutional context, it may be said that utilization of an affirmative preference for women and minorities is ameliorative, rather than invidious, and that it therefore may be permissible to be temporarily color-conscious in order to become color-blind.

▮ This concept does not mean that abuses may be tolerated in the name of affirmative action. Rather, it recognizes that in order to effect an acceptable solution to a broad social and constitutional problem, some manner of conciliation must be devised. For example, affirmative equitable relief grounded on the use of numerical racial ratios has been increasingly utilized by federal courts to eradicate the continuing effects of past discrimination. In the context of desegregating public schools, the Supreme Court has sanctioned the use of "mathematical ratios" as a "useful starting point in shaping a remedy to correct past unconstitutional violations." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 25, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971). The Supreme Court recently has upheld the use of affirmative relief in the area of voting rights, even when the action taken to remedy past discrimination may impinge the rights of nonminorities. *United Jewish Organizations of Williamsburgh, Inc. v. Carey*, —— U.S. ——, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977). Affirmative relief has been specifically approved in employment discrimination litigation brought under Title VII of the Civil Rights Act of 1964 [16] and the Philadelphia Plan and other similar programs which have been instituted pursuant to Executive Order 11246.[17] And most significantly, quota relief frequently has been imposed against public agencies that have engaged in employment practices shown to be violative of the Fourteenth Amendment.[18] See also

---

**15.** To illustrate this concept, President Johnson used the image of a shackled runner: "Imagine a hundred yard dash in which one of the two runners has his legs shackled together. He has progressed 10 yards, while the unshackled runner has gone 50 yards. At that point the judges decide that the race is unfair. How do they rectify the situation? Do they merely remove the shackles and allow the race to proceed? Then they could say that "equal opportunity" now prevailed. But one of the runners would still be forty yards ahead of the other. Would it not be the better part of justice to allow the previously shackled runner to make up the forty yard gap; or to start the race all over again? That would be affirmative action towards equality."

**16.** See, e. g., *United States v. N. L. Industries, Inc.*, 479 F.2d 354 (8th Cir. 1973); *United States v. IBEW Local No. 212*, 472 F.2d 634 (6th Cir. 1973); *United States v. Wood Lathers Local No. 46*, 471 F.2d 408 (2d Cir. 1973), cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973); *United States v. Carpenters Local*

*No. 169*, 457 F.2d 210 (7th Cir. 1972), cert. denied, 409 U.S. 851, 93 S.Ct. 63, 34 L.Ed.2d 94 (1972); *United States v. Ironworkers Local 86*, 443 F.2d 544 (9th Cir. 1971), cert. denied 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); *United States v. IBEW Local No. 38*, 428 F.2d 144 (6th Cir. 1970), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970); *Asbestos Workers Local 53 v. Vogler*, 407 F.2d 1047 (5th Cir. 1969).

**17.** See, e. g., *Southern Illinois Builders Ass'n. v. Ogilvie*, 471 F.2d 680 (7th Cir. 1972); *Contractors Ass'n v. Secretary of Labor, Shultz*, 442 F.2d 159 (3d Cir. 1971), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); *Joyce v. McCrane*, 320 F.Supp. 1284 (D.N.J.1970); see also *Associated General Contractors v. Altshuler*, 490 F.2d 9 (1st Cir. 1973).

**18.** See, e. g., *Carter v. Gallagher*, 452 F.2d 315 (8th Cir. en banc 1971), cert. denied 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); *NAACP v. Allen*, 493 F.2d 614 (5th Cir. 1974);

*United States v. Montgomery Bd. of Educ.,* 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969); *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). Thus there is ample precedent for the proposition that temporary, short-range preferences for minorities may be mandated by the duty to eradicate the continuing effects of past discrimination. As the Court of Appeals for the Fifth Circuit has stated, "By mandating the hiring of those who have been the object of discrimination, quota relief promptly operates to change the outward and visible signs of yesterday's racial distinctions and thus, to provide an impetus to the process of dismantling the barriers, psychological or otherwise, erected by past practices. It is a temporary remedy that seeks to spend itself as promptly as it can by creating a climate in which objective, neutral employment criteria can successfully operate to select public employees solely on the basis of job-related merit. For once an environment where merit can prevail exists, equality of access satisfies the demand of the Constitution." *NAACP v. Allen, supra,* 493 F.2d at 621.

In this case we are not dealing with a situation of court-imposed affirmative relief pursuant to a finding of discrimination against women and minorities in employment practices.[19] Rather, plaintiffs would have the Court find discrimination against the so-called "majority" employees of the Kansas City Fire Department who allegedly have been injured by the operation of the

Fire Department's *voluntary* attempt to remedy the "imbalances (which) may have developed in the utilization of minorities and women." Code of General Ordinances of Kansas City, Missouri, No. 42406, *supra.* This Court is told, as was the Fifth Circuit Court of Appeals in *NAACP v. Allen, supra,* that the affirmative action plan compels a violation of the Fourteenth Amendment rights of eligible white employees by discriminating in favor of less qualified minority individuals, whose examination scores and seniority resulted in a lower ranking on the personnel department's list. As in the *Allen* case, this Court is urged to accept the argument that the best hope for eliminating discrimination in public employment is through the established competitive merit system rather than a remedial program. And as did the Fifth Circuit Court of Appeals in *Allen,* this Court must look to the various interests protected by the Fourteenth Amendment and weigh the competing interests asserted by the parties herein and raised by this extremely sensitive and complex question.

We begin with the basic that no person possesses a constitutional right to public employment. *NAACP v. Allen, supra,* 493 F.2d at 618; *Bridgeport Guardians, Inc. v. Bridgeport Civil Service Comm'n,* 482 F.2d 1333, 1337 (2d Cir. 1973); see *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 29–34, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) ("It is not the province of this court to create substantive constitu-

*Boston Chapter NAACP v. Beecher,* 504 F.2d 1017 (1st Cir. 1974); *Bridgeport Guardians, Inc. v. Bridgeport Civil Service Commission,* 482 F.2d 1333 (2d Cir. 1973); *Pennsylvania v. O'Neill,* 473 F.2d 1029 (3rd Cir. 1973) (en banc); *Castro v. Beecher,* 459 F.2d 725 (1st Cir. 1972); see also *Morrow v. Crisler,* 491 F.2d 1053 (5th Cir. 1974).

**19.** As Justice Brennan recently stated in his concurring opinion in *United Jewish Organizations of Williamsburgh, Inc. v. Carey,* —— U.S. ——, ——, n. 2, 97 S.Ct. 996, 1013, 51 L.Ed.2d 229 (March 1, 1977); "Of course, it could be suggested that the remedial rules upheld in these earlier cases acquired added legitimacy because they generally arose in the form of judicial decrees rather than affirmative legislative or executive action. Arguably, a court-im-

posed remedy to correct a ripe finding of discrimination should be accorded particular respect. Yet, *the role of the judiciary is not decisive.* First, as is the case here, even a legislative policy of remedial action can be closely tied to prior discriminatory practices or patterns. (Citation omitted.) Second, many of the criticisms discussed below that commonly are leveled against the benign use of racial remedies—e. g., the potential for arousing race consciousness and the likelihood of imposing disproportionate burdens of compliance upon relatively "innocent" whites—remain relevant regardless of the decision-maker who imposes the remedial regime. *I believe, therefore, that the history of equitable decrees utilizing racial criteria fairly establishes the broad principle that race may play a legitimate role in remedial policies.* (Emphasis supplied.)

tional rights in the name of guaranteeing equal protection of the laws." Id. at 33, 93 S.Ct. at 1297). Thus, operation of the City's affirmative action plan denies no one any specific right conferred by the Constitution. Nor is it the purpose of affirmative action to require that anyone who lacks job-related qualifications be employed. Plaintiffs in this case do not contend that the City's plan compels hiring or promotion of unqualified individuals, and the four Fire Captains promoted to the position of Battalion Chief each were on the list of those qualified for that position.[20]

With respect to the equal protection argument, the Courts have upheld the operation of affirmative action plans against charges of racial discrimination where, as here, the actions taken under the plan were the result of a good faith attempt to equalize past injustices, on the basis that such affirmative hiring relief fails to transgress either the letter or the spirit of the Fourteenth Amendment. In *Carter v. Gallagher, supra,* the Eighth Circuit upheld the trial court's order of an affirmative quota for hiring of minority employees of the Minneapolis Fire Department; in so doing, the Court weighed the conflicting interests presented, noting that "the absolute preference ordered by the trial court would operate as a present infringement on those non-minority group persons who are equally or superiorly qualified for the fire fighter's positions," supra at 330, but concluded, "To accommodate these conflicting considerations, we think some reasonable ratio for

hiring minority persons who can qualify under the revised qualification standards is in order for a limited period of time, or until there is a fair approximation of minority representation consistent with the population mix in the area." *Id.* The Fifth Circuit Court of Appeals similarly upheld quota relief in *NAACP v. Allen,* stating that "It is the collective interest, governmental as well as social, in effectively ending unconstitutional racial discrimination, that justifies temporary, carefully circumscribed resort to racial criteria, whenever . . . it represents the only rational, nonarbitrary means of eradicating past evils."

Plaintiffs cite an unreported decision, *Brunetti v. City of Berkeley,* 11 E.P.D. ¶ 10, 804 (N.D.Cal. Oct. 17, 1975), as authority for the proposition that a voluntary affirmative action program which results in promotion of a minority municipal fire department employee over a higher-ranked white candidate is invalid where there is no showing that the city's job practices were discriminatory or that the program was needed to correct past racial discrimination. With due respect for the reasoning of the District Court for the Northern District of California from the cases cited within its unreported decision, this Court simply does not arrive at the same conclusion. The requirement of a finding of past discrimination before a court, in the exercise of its broad equitable power, may *compel* implementation of an affirmative action plan, including quota relief,[21] does not necessarily mandate

---

**20.** Nor may plaintiffs base a claim of right solely upon their eligibility rankings according to their test scores and seniority. The record in this case includes no evidence of the validity of the eligibility test administered by the Personnel Department, and no contention is made that the test is racially discriminatory. This Court, therefore, will not interfere with the operation of the selection system as set forth in the City Charter, § 121. Furthermore, the Court notes it would be speculative to assume that the qualifying test, in addition to separating those applicants who are qualified from those who are not, also ranks qualified applicants with precision, statistical validity, and predictive significance. See *Carter v. Gallagher,* supra at 331. Thus it is impossible to argue with certainty that minority individuals who

may be hired under the affirmative action plan are truly less, or more, qualified than others ranked slightly higher on the list, who may be rejected. See *NAACP v. Allen, supra,* 493 F.2d at 618. This Court will not compel promotions in rank order from the certification list where the City Charter has failed to mandate that procedure.

**21.** See *Brunetti v. City of Berkeley, supra; United States v. Local Union No. 212 Internat'l. Brotherhood of Electrical Workers,* 472 F.2d 634, 636 (6th Cir. 1973); *Contractors' Ass'n. of Eastern Pennsylvania v. Secretary of Labor,* 442 F.2d 159, 175 (E.D.Pa.1971); *Stamps v. Detroit Edison Co.,* 365 F.Supp. 87, 119 (E.D. Mich.1973).

the conclusion that an employer may not *voluntarily* implement a reasonable, short-term affirmative action plan to remedy the effects of historical discrimination. That conclusion, which in effect would require employers to admit past discrimination or wait until they were sued by a minority individual and compelled to implement affirmative action, would fly in the very face of the conciliatory efforts intended to be made under Executive Order 11246, and would appear to this Court to contradict the spirit of the Fourteenth Amendment and its mandate to remove not only the incidence of discrimination but its *effects* as well.

It is true that a voluntary program of affirmative action runs the risk of infringing unnecessarily the rights of non-minority individuals. As the Supreme Court of California stated in *Bakke v. Regents of University of California*, 18 Cal.3d 34, 132 Cal.Rptr. 680, 553 P.2d 1152, 1171 (1976), now pending before the United States Supreme Court on writ of certiorari, "Originated as a means of exclusion of racial and religious minorities . . . a quota becomes no less offensive when it serves to exclude a racial majority." [22] In the absence of a finding of specific past discrimination requiring specific relief, there can be no doubt that an employer must make a clear and convincing showing of an acceptable basis for the affirmative action plan which is temporarily imposed and reasonably drawn to meet the demonstrated need. While such a showing admittedly places a difficult burden of justification upon an employer, this Court believes that an employer who meets that burden may establish the validity of a plan which grants a preference to minorities even if it necessarily results in detriment to the majority. Whenever there is a limited pool of resources from which minorities have been

disproportionately excluded, equalization of opportunity can only be accomplished by reallocation of those resources. In that process, detriment to nonminorities is inevitable. Nevertheless, the effects of discrimination in this country run deep and wide, see e. g., *Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970), and upon an appropriate showing, by means carefully-drawn and temporarily-imposed to meet the requirements of Executive Order No. 11246, in attempting to remedy that discrimination, a voluntary affirmative action plan may withstand a challenge that it discriminates invidiously against members of nonminority groups. While fraught with particularly sensitive social and constitutional considerations, this conclusion appears the one most consistent with the fundamental interests of all races and with the design of the Constitution itself. Recent decisions by the United States Supreme Court support this conclusion.

In *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444, 468 (1976), a class action by minority employees against an employer and certain unions for racially discriminatory employment practices in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the United States Supreme Court expressly rejected the assertion that retroactive seniority relief should be denied members of minority groups who have suffered discrimination merely because the interests of majority employees thereby would be adversely affected. Such an action, said the Court, would "generally frustrate the central 'make-whole' objective of Title VII." *Id.* 424 U.S. at 774, 96 S.Ct. at 1269, 47 L.Ed.2d at 467. Thus the Supreme Court, in a statutory context, has recognized the principle of ameliorative discrimination, as discussed more fully below.

---

**22.** The *Bakke* case, in which the California Supreme Court determined that the special admission program benefitting disadvantaged minority students who apply for admission to the medical school of the University of California at Davis violated the constitutional rights of nonminority applicants since it afforded preference on the basis of race in the absence of a showing that the medical school previously had discriminated against minorities, is cited only in recognition of the facts that infringement of the rights of a racial majority is proscribed by the Fourteenth Amendment, and that the definition of so-called "reverse discrimination" is a particularly sensitive, hotly-contested issue on which courts easily are capable of reaching differing conclusions.

In *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), where two Negro police officers challenged the validity of a written personnel test which allegedly discriminated against black applicants for positions with the Police Department of the District of Columbia, the Supreme Court held that unlike the standard applicable in actions brought under Title VII, the invidious quality of a law claimed to be racially discriminatory under the Fourteenth Amendment must ultimately be traced to a *racially discriminatory purpose.* The Court stated,

> The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race. . .  But our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact. (Emphasis in original.) *Id.* 426 U.S. at 239, 96 S.Ct. at 2047, 48 L.Ed.2d at 607.

*United Jewish Organizations of Williamsburgh, Inc. v. Carey,* —— U.S. ——, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977), represents the Supreme Court's most recent statement that racial considerations are permissible to correct past discrimination. The plaintiffs, on behalf of the Hasidic Jewish community residing in Kings County, New York, sought injunctive and declaratory relief under the Fourteenth and Fifteenth Amendments, alleging that New York State's 1974 reapportionment plan with respect to Kings County and two other counties which were subject to §§ 4 and 5 of the Voting Rights Act, 42 U.S.C. § 1973, would dilute the value of their franchise by halving its effectiveness, solely for the purpose of achieving a racial quota, and that they were assigned to electoral districts solely on the basis of race.[23] A majority of the Court concluded that the use of racial criteria by the State of New York in attempting to comply with § 5 of the Voting Rights Act and to secure the approval of the Attorney General as provided therein did not violate the Fourteenth or Fifteenth Amendment, and stated that the Constitution does not prevent a state subject to the Voting Rights Act from deliberately creating or preserving black majorities in particular districts in order to ensure that its reapportionment plan complies with § 5, despite the corresponding infringement on rights of white voters.

The majority based its decision, in major part, upon its prior cases construing and sustaining the constitutionality of the Voting Rights Act, *Beer v. United States,* 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976); *City of Richmond v. United States,* 422 U.S. 358, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975), and the fact that "the Act was itself broadly remedial in the sense that it was 'designed by Congress to banish the blight of racial discrimination in voting . . ..'" *South Carolina v. Katzenbach,* 383 U.S. 301, 308, 86 S.Ct. 803, 808, 15 L.Ed.2d 769 (1966). It is significant for purposes of the present case, however, that the Court was faced with the argument that even if racial considerations might be used to remedy the residual effects of past unconstitutional reapportionments, there were no findings of prior discriminations in New York to justify the affirmative remedy of reassigning white voters to increase the size of black majorities in certain districts. In response, the Court stated that "The permissible use of racial criteria is not confined to eliminating the effects of past discriminatory districting or apportionment."

■ Although the majority's decision was founded upon the Voting Rights Act

---

**23.** The 1974 plan did not change the number of electoral districts with nonwhite majorities but did change the size of nonwhite majorities in most of those districts. To attain a nonwhite majority of 65%, which it was felt would be acceptable to the Attorney General for the assembly district in which the Hasidic Jewish community was located (which had been 61% nonwhite under the 1972 plan), a portion of the white population, including part of the Hasidic community, was reassigned to an adjoining district, and that community also was split between two seniority districts though it had been within one such district under the 1972 plan.

and the strong Congressional intention to combat discriminatory voting laws, the Court's view that the statutory mandate represented, in effect, a defense to the charge of reverse discrimination, is significant for the present case, as is the Court's statement that " . . . the creation of substantial nonwhite majorities in approximately 30% of the senate and assembly districts in Kings County was *reasonably related to the constitutionally valid statutory mandate of maintaining nonwhite voting strength*." [24] Thus, the Supreme Court adopted a "rational basis" test for the state's action though the state admittedly had utilized racial classifications in assigning voters under the reapportionment plan. Even more significantly, in what it has termed a "second, and independent, ground for sustaining the particulars of the 1974 plan for Kings County," the majority opinion states:

There is no doubt that in preparing the 1974 legislation, the State deliberately used race in a purposeful manner. But its plan represented no racial slur or stigma with respect to whites or any other race, and we discern no discrimination violative of the Fourteenth Amendment nor any abridgment of the right to vote on account of race within the meaning of the Fifteenth Amendment.

It appears, therefore, that where a good faith attempt is made under a valid mandate to remedy past racial imbalances, rather than with an invidious intent, the Fourteenth Amendment does not bar the affirmative action even where the result infringes the rights of nonminorities. The analogy to the present situation is obvious.

Moreover, though he chose to decide the issue solely on the basis of the Voting Rights Act, Justice Brennan considered the alternative of adopting a broad "benign discrimination" theory, and discussed it as follows in his concurring opinion:

"(I)f the racial redistricting involved here, imposed with the avowed intention of clustering together 10 viable nonwhite majorities at the expense of preexisting white groupings, is not . . . to be prohibited, the distinctiveness that avoids this prohibition must arise from either or both of two considerations: the permissibility of affording preferential treatment to disadvantaged nonwhites generally, or the particularized application of the Voting Rights Act in this instance.

The first and broader of the two plausible distinctions rests upon the general propriety of so-called benign discrimination: the challenged race assignment may be permissible because it is cast in a remedial context with respect to a disadvantaged class rather than in a setting that aims to demean or insult any racial group. *Even in the absence of the Voting Rights Act, this preferential policy plausibly could find expression in a state decision to overcome nonwhite disadvantages in voter registration or turnout through . . . the application of a numerical rule—in order to achieve a proportional distribution of voting power*." (Emphasis supplied.)

In summary, the United States Supreme Court has indicated a willingness to recognize that under appropriate circumstances, voluntary affirmative action to remedy racial imbalances must be tolerated.

The United States District Court for the District of Columbia fashioned a creative solution to an analogous situation which it faced in the case of *McAleer v. American Telephone and Telegraph Co.*, 416 F.Supp. 435 (D.D.C.1976). In that case, plaintiff McAleer was denied promotion by AT&T because the position was given to a less qualified, less senior female solely because of her sex, under the provisions of a nationwide consent decree requiring AT&T to establish an affirmative action program with goals and timetables to improve the employment situation for women and minorities. *EEOC v. American Telephone & Telegraph Co.*, 365 F.Supp. 1105 (E.D.Pa.1973), aff'd in part, 506 F.2d 735 (3d Cir. 1974). In response to the plaintiff's action for damages and promotion under Title VII of the Civil Rights Act of 1964, as amended, 42

24. Emphasis ours.

U.S.C. §§ 2000e *et seq.*, AT&T asserted the consent decree as a complete defense. As in the present case, there was no admission by AT&T or finding by the Court that the consent decree was based upon past constitutional or statutory violations, although it was clear from AT&T's acceptance of the decree that it had not been in compliance with federal law requiring utilization of women. As here, it was undisputed that the defendant acted in good faith in relying on the consent decree, and that it properly applied the decree and the attendant affirmative action program. The Court recognized that the plaintiff stood as an innocent employee who had earned promotion but was disadvantaged when AT&T rejected his application in order to rectify its past underutilization of women. Even so, relying upon *Franks v. Bowman Transportation Company, Inc., supra*, the Court determined that the consent decree and affirmative action plan, having been essential to rectify violations by AT&T of its obligations under federal law, justified AT&T's action with respect to the plaintiff, so that he was not entitled to the injunctive remedy of promotion, and stated that "to award such relief might well perpetuate and prolong the effects of the discrimination that the Philadelphia Consent Decree was designed to eliminate." [25] See also *Mele v. United States Dept. of Justice*, 395 F.Supp. 592 (D.N.J.1975), holding that a complaint brought by a white employee alleging racial discrimination as the result of the implementation of an affirmative action plan which set a quota for hiring 30 minority individuals for each 5 whites must be dismissed where the plan was a valid exercise of action by the executive branch designed to remedy past exclusion of minorities from employment and where a consent decree approving the plan was under the equitable power of the court.

Under the existing case authority, and particularly in light of recent pronouncements by the United States Supreme Court, injunctive relief for white employees claiming "reverse discrimination" may not be warranted where the alleged discrimination results from a good faith attempt to comply with affirmative action requirements under Executive Order 11246 and where the affirmative relief taken is reasonably tailored to meet those requirements.

---

**25.** The district court also noted the Supreme Court's reference in *Franks* to the possibility of compensating with monetary damages innocent employees who are adversely affected by an employer's corrective action, based upon a recognition of the need to share among the respective parties the burden of eradicating past discrimination and achieving equality of employment opportunities, rather than casting the entire burden upon hapless individuals such as plaintiff McAleer. In particular, the Supreme Court in *Franks* noted that courts should attempt to protect innocent employees by casting the burden, wherever possible, upon the wrongdoing employer:

> "We are of the view . . . that the result which we reach today—which, standing alone, establishes that a sharing of the burden of the past discrimination is presumptively necessary—is entirely consistent with any fair characterization of equity jurisdiction, particularly when considered in light of our traditional view that '(a)ttainment of a great national policy . . . must not be confined within narrow canons for equitable relief deemed suitable by chancellors in ordinary private controversies.' *Phelps Dodge Corp. v. NLRB*, 313 U.S. [177] at 188, 61

S.Ct. 845, 85 L.Ed. 1271, [133 A.L.R. 1217]" 424 U.S. at 777, 96 S.Ct. at 1271, 47 L.Ed.2d at 469.

Agreeing with the sentiments thus expressed in *Franks*, the district court in *McAleer* held that although injunctive relief was not available to the plaintiff "victimized" by the affirmative action plan, he was entitled to damages compensating him for the injury he incurred:

> "The Court recognizes that it may well be impossible through a monetary award for economic losses to compensate plaintiff fully for the injury he has incurred. On the other hand, since McAleer had no responsibility for AT&T's past sex discrimination, it is AT&T rather than McAleer who should bear the principal burden of rectifying the company's previous failure to comply with the Civil Rights Act of 1964. An affirmative award of some damages on a 'rough justice' basis is therefore required and will constitute an added cost which the stockholders of AT&T must bear. *See NAACP v. FPC*, 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976)."

While a remedy in damages might be pursued under the rationale of the *Franks* and *McAleer* cases that issue is not before this Court and need not be decided herein.

The issue next before this Court, therefore, is whether or not the record in this case illustrates that defendants have met the standard required for maintenance of their affirmative action program. There can be no doubt that defendants' affirmative action program is a good faith attempt to comply with the requirements of federal law under Executive Order 11246. As revealed by Exhibit G to the Second Joint Stipulation of Facts filed by the parties, affirmative action compliance is mandated by the receipt of substantial federal funds attached to the administrative "string" that assurance of affirmative action be given. The evidence is undisputed that defendants have established by careful study the procedures for identifying those positions requiring affirmative action, and followed those procedures scrupulously. The goals set under the City's plan are based upon thorough evaluation of utilization of women and minorities in comparison with population data, expected retirements and attrition within the department, and anticipated budgetary changes. The goals are reviewed and revised, if necessary, on an annual basis, by reference to the above criteria and the Labor Department guidelines for affirmative action. The plan adopted by the City does not call for the imposition of quotas, and has not been operated so as to impose quotas. The evidence reveals that the City's affirmative action plan is a careful attempt to meet the Labor Department standard of good faith action in employing and promoting women and members of minority groups. There is no discriminatory intent present in the fact that this affirmative action plan has been implemented in Kansas City, Missouri.

Nor is there evidence that the plan challenged herein is not reasonably tailored to meet its good faith objectives. The parties have attached to their Second Joint Stipulation statistical profiles of the Fire Fighting Division of the Kansas City, Missouri, Fire Department, identifying by job title the percentage of minority and nonminority employees in each of the job classifications.[26] In addition, the parties have jointly filed statistical data, prepared by the Missouri Department of Labor and Industrial Relations and meeting the requirements of the Office of Federal Contract Compliance, showing the percentage of available minorities within the job market in Kansas City, Missouri, and the percentage of minorities within the specific classifications which the parties deem applicable to the job classifications within the Fire Department.[27] Finally, the record includes the specific goals set for the Fire Department by job classification, for the years 1976 and 1977.[28] While it is neither

26. The figures reveal that in 1970, the census period operative prior to the adoption of the City's affirmative action plan and still operative today, the Fire Fighting Division employed 87.8% Caucasian firemen, and 13.9% minority firemen. As of June 4, 1976, just prior to the contested promotions, the Fire Fighting Division employed 85.9% Caucasian firemen and 14.1% minority firemen. Within the specific job classifications relevant herein, the rank of Battalion Chief was 83.3% Caucasian and 16.7% minority; the rank of Fire Captain was 90.4% Caucasian and 9.6% minority.

27. According to the 1970 census—the most recent data available, the labor pool in Kansas City, Missouri, was 77.2% Caucasian and 22.8% minority. Of those individuals within the "protective service" classification, which the parties hereto deem applicable to firemen other than the Fire Apparatus Operators, 15.5% were minority; of those individuals in Kansas City, Missouri, within the classification "transportation equipment operatives," applicable to the position of Fire Apparatus Operator, 22.9% are members of minority groups.

28. The goals set for the Fire Department Fire Fighting Division in 1976 were as follows: Increase the number of minority individuals at the entry-level rank of Fire Fighter from 59 to 84 by adding 25, thereby increasing the percentage from 13.4% to 19.0%; increase the number of minority Fire Apparatus Operators from 28 to 38 and the percentage at that rank from 12.4% to 16.8%; increase the number of minority Captains from 17 by adding 7, or from 10.1% to 14.2%; increase the number of minority Battalion Chiefs from 3 to 7, or from 14.2% to 33.3%. On the basis of the same factors considered in establishing the 1976 goals, plus recognition of the fact that the Fire Department's promotional system is exclusively vertical, the goals set for 1977 are as follows: Increase the minority Fire Fighters by adding 25; increase the number of minority Fire Apparatus Operators by adding 13; increase the number of minority Captains by adding 8; in-

this Court's function nor inclination to attempt precise definition of what constitutes "underutilization" within the meaning of the Labor Department's regulations, it cannot be concluded from these figures, revealing a minority availability of approximately 23% and minority employment within the Fire Department of approximately 14%, that minority individuals have not been underutilized with respect to their availability in the labor market; indeed, these figures indicate substantial discrepancy between the available and the employed. Additionally, and to be emphasized from this Court's point of view, is the short-term nature of the goals established under the City's affirmative action plan. This record reveals the challenged plan to be reasonable and conservatively tailored to meet its legitimate and good faith objective under Executive Order 11246.

That objective is set forth in the "Policy Statement on Affirmative Action Programs for State and Local Government Agencies" prepared by the Office of the Deputy Attorney General for the Equal Employment Opportunity Coordinating Council and attached to the parties' Second Joint Stipulation as Exhibit H.

> The remedy for . . . past and present discrimination is two-fold. On the one hand, vigorous enforcement of the laws against discrimination is essential. But equally, and perhaps even more important, are affirmative, voluntary efforts on the part of public employers to assure that positions in the public service are genuinely and equally accessible to qualified persons, without regard to their sex, racial or ethnic characteristics. Without such efforts, equal employment opportunity is no more than a wish. The importance of voluntary affirmative action on the part of employers is underscored by Title VII of the Civil Rights Act of 1964, Executive Order 11246, and related laws and regulations—all of which emphasize voluntary action to

achieve equal employment opportunity . . . .

> Voluntary affirmative action to assure equal employment opportunity is appropriate at any stage of the employment process. The first step in the construction of any affirmative action plan should be an analysis of the employer's work force to determine whether percentages of sex, race or ethnic groups in individual job classifications are substantially similar to the percentages of those groups available in the work force in the relevant job market who possess the basic job related qualifications . . . . *When an employer has reason to believe that its selection procedures have (this) exclusionary effect . . . it should initiate affirmative steps to remedy the situation. Such steps . . . in design and execution may be race, color, sex or ethnic "conscious" . . . .* (Emphasis supplied.)

The record further reveals that defendants have done no more than adhere faithfully to the policy established by the federal government pursuant to federal law. In so doing, they have formulated an affirmative action plan utilizing short-term goals which, although admittedly based upon race, seek by reasonable means to alleviate the actual, present underutilization of minorities revealed through careful study of employment and population statistics and recognized as the result of historical societal discrimination. See *Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970). This Court does not attempt to set forth either the minimum or maximum steps that employers may take to deal with their own employment situations, but it is clear from the case authority that under appropriate circumstances, voluntary measures may be taken, and it is clear from the record herein that defendants have met their responsibility to take affirmative action to remedy past racial distinctions without violating their compelling duty to avoid invidious discrimi-

---

crease the number of minority Battalion Chiefs by adding 4. Thus, the 1977 goals remain substantially the same as those established for 1976.

nation against members of the so-called majority. Employers who undertake voluntary affirmative action do walk a thin line, but defendants have walked it well—neither the Fourteenth Amendment nor the Civil Rights Act prohibits their conduct.

The Court is aware that in this situation no resolution will be a happy one for all parties. Nevertheless, as the United States Supreme Court has recognized, this situation calls for a sharing of the burden of past discrimination, *Franks v. Bowman Transportation Co., supra,* and under these circumstances, the injunctive relief sought by plaintiffs is simply inappropriate. An impetus *is* necessary to further the process of dismantling the barriers erected by past discrimination, and affirmative action properly applied, that is, a "temporary remedy that seeks to spend itself as promptly as it can by creating a climate in which objective, neutral employment criteria can successfully operate to select public employees solely on the basis of job-related merit," *NAACP v. Allen, supra,* is mandated by the very principle of equal opportunity which plaintiffs espouse. Properly applied, affirmative action seeks not just equality as a right and a theory but equality as a *fact* and equality as a *result.* Where, as here, that quest for equality does not invidiously discriminate against the rights of any group, the mandate of the Fourteenth Amendment is not violated, but satisfied.

It is now, therefore,

ORDERED that plaintiffs' motion for injunctive relief in this cause be, and it is hereby, denied.